Henry M. Dearing, as Trustee for the Creditors of The Elms Buggy Company, a Corporation, Appellant, *v.* McKinnon Dash and Hardware Company, Limited, et al., Respondents.

1. Comity — Enforcement within State of Instrument Valid under Lex Domicilii. Judicial comity does not require the courts of this state to enforce any clause of an instrument executed by a foreign corporation to secure creditors, which, even if valid under the *lex domicilii*, conflicts with the policy of the state relating to property within its borders, or impairs the rights or remedies of domestic creditors.

2. Transfer Valid where Made, when Invalid Here — Effect on Property within the State. A transfer in another state, although valid there, which would be void as to creditors if made here, does not confer title to personal property situated here that is good as against a resident of this state armed with legal process to collect a debt.

3. Trust Mortgage Executed by Foreign Corporation — Validity as to Chattels within this State — Effect of Provision for Forced

EXTENSION OF TERM OF CREDIT. An instrument, executed by an insolvent foreign corporation, which according to the law of the domicile, duly proved on the trial, is a trust mortgage upon chattels, is, even if valid under the *lex domicilii*, invalid as to chattels within this state and ineffectual to withdraw them from attachment by domestic creditors of the foreign corporation, where it permits the corporation to keep possession of the property and continue its business, to buy, manufacture and sell "in the usual course of trade," requires all creditors before they can take any benefit therefrom to come in under it and accept its terms, and if their debts become due before the mortgage to so extend the time of payment that they cannot be enforced until after the mortgage matures, a period of ninety days, and provides, without specifying the time, that the corporation shall furnish the trustee with a schedule of the names of the creditors and the amount of their claims, which shall be taken to be a part of the instrument so far as designating the persons to whom the residue of the proceeds, realized upon the sale of the property, after the payment of the expenses, taxes, etc., shall be distributed.

4. WHEN INSTRUMENT VALID ON FACE MAY BE ATTACKED FOR ACTUAL FRAUD. Independent of the coercive provisions of the instrument which rendered it void upon its face, the peculiar circumstances of the case held to present a question of fact as to actual and intentional fraud on the part of the mortgagor.

5. NECESSITY OF PLEADING PROVISIONS RELATING TO FRAUDULENT CONVEYANCES. A pleader who seeks to justify the seizure of goods under legal process, notwithstanding a previous transfer, is not required to refer to the statutory provisions relating to fraudulent conveyances. It is sufficient to allege that the goods levied upon were the property of the person against whom the process was issued, or that he had a leviable or attachable interest therein. The portions of the Statute of Frauds that are waived, unless pleaded, relate to contracts which although previously capable of valid proof by parol evidence, are declared to be void unless in writing.

*Dearing* v. *McKinnon Dash & Hardware Co.*, 33 App. Div. 31, affirmed.

(Argued October 17, 1900; decided November 27, 1900.)

APPEAL from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered August 4, 1898, which reversed a judgment in favor of plaintiff entered upon a verdict, and an order denying a motion for a new trial and granted a new trial.

This is an action of replevin brought by the plaintiff, as trustee for the creditors of a corporation organized under the laws of another state, to recover the possession of a quantity of buggies attached by a sheriff in this state. The defendants

are the indemnitors of the sheriff and were substituted as par-
ties in his place pursuant to the provisions of the Code of
Civil Procedure.    They justify through him under an attach-
ment issued out of the Supreme Court on the 27th of June,
1896, in favor of the McKinnon Dash & Hardware Company,
a domestic corporation, against the Elms Buggy Company, a
corporation formed under the laws of the state of Michigan,
and levied upon the property in question while stored in the
city of Rochester.

The title of the plaintiff depends upon a certain indenture
executed in the state of Michigan on the 22nd of May, 1896,
between the Elms Buggy Company, as party of the first part,
and the plaintiff, as party of the second part.    The first party,
after reciting its insolvency, purports to " grant, bargain, sell
and mortgage unto the said party of the second part, as trus-
tee for the said creditors," all its personal property, consisting
among other things of buggies, finished and unfinished, and
material and tools for making buggies, " said goods and chat-
tels now remaining and continuing in the possession of said
party of the first part at its factory in said city of Albion,
county of Calhoun and state of Michigan."    " Said first party
also simultaneously herewith mortgaging to said trustee all its
realty in said city of Albion, where its factory is located and
it is doing business,  *  *  *  in trust for the same purposes
hereinafter expressed."

The instrument also covered buggies stored in the states of
New York, Iowa and Wisconsin, and required the party of
the second part, as trustee, to dispose of the property thus
transferred " at any time in the best manner and for the best
prices he can obtain for the same at wholesale, retail or in job
lots, as in his judgment shall be best for the beneficiaries
herein, and to receive payment therefor, and to apply the
proceeds in the manner hereinafter provided, after deducting
all necessary expenses of taking possession of the same and
of disposing thereof."    Then follows a list of creditors, four in
number, whose claims amount in the aggregate to $51,000,
including the First National Bank of Albion for $41,000,

evidenced by promissory notes made by said first party, one of which for $15,000 was indorsed by Fred L. Elms, and another for $6,000 was indorsed by Charles B. Gale.

It appeared by extrinsic evidence that said Elms and Gale constituted one-half of the directors, and by the execution of said indenture that the former was president and the latter secretary of the Elms Buggy Company. It also appeared that the plaintiff was cashier of the First National Bank of Albion, the principal creditor.

The instrument then continues: "And it is also indebted to divers and sundry other persons, firms, corporations, etc., elsewhere, in divers amounts aggregating about the sum of $34,000; therefore, these presents are upon the express condition that if the party of the first part shall and do, ninety days after date hereof, well and truly pay or cause to be paid to the several creditors and classes of creditors before mentioned, in the order above mentioned, the several debts, liabilities and obligations to them and each member thereof respectively owing   *   *   *   and shall also pay, satisfy and discharge all of its other indebtedness and liabilities, whether specifically named or not but intended to be secured hereby, then this instrument to be void; otherwise to remain in full force."

After a covenant by the first party to pay said debts within the period mentioned there followed what is known as the "coercive clause," to wit: "And it is expressly understood that each and every of the said persons and corporations above mentioned or referred to, and who are intended to be benefited hereby, *shall accept and abide by the terms and conditions of this security, and the same shall only operate in favor of those who shall, after knowledge hereof, avail themselves of the security of this instrument and accept and abide by the terms and conditions hereof, and all whose debts are due or to become due within ninety days shall assent to an extension of the same for said period.*"

If default was made in the payment of any of the debts by the first party, or if it should dispose of its property

11

" except in accordance with the terms of this agreement," as thereinafter specified, or should remove any part thereof from its factory without the consent of the second party, " except in the usual course of trade and in accordance with the terms and conditions of this mortgage," or if the first party should " deem himself or said debts insecure," he was entitled to take possession of the property and " make sale thereof at public auction, at wholesale, retail, or in job lots, to the highest bidder or bidders, or at private sale and in bulk or parcel at his option."

From the moneys realized " upon this mortgage in any manner by said trustee," he was required to pay the expenses of executing the trust, all taxes, insurance and a reasonable compensation to himself for his services, and out of the remainder to pay the preferred creditors in the order named, and if anything was then left from the proceeds of either mortgage to " pay all of the other creditors of said first party in full *who accept of this security and assent thereto* if there be in his hands a sufficient sum for that purpose," otherwise to pay. the remainder " to all other creditors of said first party *so accepting*, ratably, share and share alike." It was expressly provided that the proceeds of said real estate mortgage should " be used and applied in the same order and in the same way as the avails of this mortgage."

The first party agreed to " furnish the trustee with a complete list or schedule of the names and post office addresses of the creditors not hereinbefore mentioned specifically, together with the amount of indebtedness owing by said first party to them respectively, and the same when complete shall be taken to be a part of this instrument, so far as designating the persons to whom said residue shall be distributed, and to whose benefit the provisions of this instrument and the avails of said real estate mortgage shall inure after payment of the expenses and other indebtedness, as before provided. ` And after the payment in full of all said claims, charges and expenses, *in the manner aforesaid*, and in the order aforesaid, said second party, as such trustee, shall deliver the surplus remaining in

his hands, if any, to said party of the first part, its successors and assigns. It is believed by the first party that it is for the benefit and advantage of the creditors for it to continue the business of manufacturing until such time as it shall have used up all of its stock now on hand, for the purpose of transforming the raw material into manufactured stock, and in case some certain lines should be exhausted, that it should buy sufficient new material of any kind not on hand necessary to complete the working up of any other available for that purpose. For this reason said first party contemplates the continuance of its said business, and of selling its said product for the benefit of those secured." The first party was required to keep an accurate account of the expenses " of so operating the business and of all receipts," and to render the same to the trustee who was given power to examine into the business, and if at any time he should " believe that the continuance of said business is not for the interest of said creditors secured hereby he shall have full power and authority to stop the operation of said factory and take possession of the said property, if he deems it necessary, and *at maturity of this mortgage* to dispose of the said property in accordance with the terms of this mortgage."

This indenture was executed pursuant to a resolution adopted by the four directors who were the only stockholders of the company, and was filed in Michigan as required by the law governing the filing of chattel mortgages in that state, and a certified copy thereof was filed with the county clerk of Monroe county in this state.

The claim of the McKinnon Dash & Hardware Company upon which said attachment was issued was founded upon a promissory note dated April 8th and falling due June 15th, 1896, for $1,128.50, made by the Elms Buggy Company and delivered by it to the attaching creditor for goods sold. The property attached formerly belonged to the Elms Buggy Company, and still belonged to it when seized under the attachment, unless title thereto, either absolute or conditional, passed to the plaintiff by virtue of said instrument.

The complaint followed the usual form in actions of replevin, except that it set forth said indenture *in hæc verba.*

The answer justified the action of the sheriff under said attachment and alleged that the chattels attached " were at the time of said attaching and taking the property of said Elms Buggy Company, or that the said Elms Buggy Company had a leviable or attachable interest therein, or that said goods were liable to be levied upon and taken by virtue of said attachment."

Upon the trial said instrument was put in evidence by the plaintiff, and it appeared that after the execution thereof the business was continued by the Elms Buggy Company, and goods were purchased by it for that purpose until February 25th, 1897, when a receiver was appointed for the company by a court in Michigan.   Evidence was given, with no express contradiction, tending to show that the claims secured were all valid demands against the company.

When the plaintiff rested the defendant moved for a nonsuit upon various grounds, and, among others, " that the instrument under which the plaintiff claims is void by the laws and policy of the state of New York as against these defendants."   At the close of all the evidence a motion to dismiss the complaint was made upon the same grounds, but both motions were denied and an exception was taken.   The defendant also asked to go to the jury upon various questions, and among them, " upon the question of intent on the part of defendant as against the Statute of Frauds in this state as to whether the conveyances were given with intent to hinder, delay and defraud creditors."

The court directed a verdict in favor of the plaintiff, but asked the jury to fix the value of the property and assess the damages for detention.   The Appellate Division reversed the judgment entered accordingly and the plaintiff comes here.

*Horace L. Bennett* for appellant.   The instrument in question is a valid chattel mortgage under the law of Michigan, by which, in the first instance, it must be construed.   (*Grand*

v. *Livingston,* 73 N. Y. S. R. 646; *People ex rel.* v. *Brady,*
56 N. Y. 182; *F. Nat. Bank* v. *F. Nat. Bank,* 77 N. Y.
320; *Warner* v. *Littlefield,* 89 Mich. 329; *Pettibone* v.
*Byrne,* 97 Mich. 85; *Cluett* v. *Rosenthal,* 100 Mich. 193;
*Nat. Bank of Oshkosh* v. *F. Nat. Bank,* 100 Mich. 485;
*Austin* v. *F. Nat. Bank,* 100 Mich. 613; *People* v. *Bristol,*
35 Mich. 28; *Grove* v. *Wise,* 39 Mich. 161.) The instrument
under consideration did not carry a transfer *in invitum,* nor
is it repugnant to any statute or the public policy of this
state, and, being a valid chattel mortgage in Michigan, as
before seen, gave the plaintiff a lien upon and the right to the
immediate possession of the property in question which the
courts of this state will enforce. ( *Vanderpoel* v. *Gorman,*
140 N. Y. 563; *Barth* v. *Backus,* 140 N. Y. 230; *Ockerman*
v. *Cross,* 54 N. Y. 29; *Hoyt* v. *Thompson,* 19 N. Y. 207;
*Kelstadt* v. *Reilly,* 55 How. Pr. 373; *Nichols* v. *Mase,* 94
N. Y. 160; *Teel* v. *Yost,* 128 N. Y. 387; *R. W. Co.* v. *Field-*
*ing,* 101 N. Y. 504; *Dunham* v. *Whitehead,* 21 N. Y. 131;
*Delaney* v. *Valentine,* 154 N. Y. 692.) The defendants, not
having demurred to the complaint or set up the Statute of
Frauds, cannot now avail themselves of the statute as a
defense. ( *Crane* v. *Powell,* 139 N. Y. 379; *Matthews* v.
*Matthews,* 154 N. Y. 288; *Sanger* v. *French,* 157 N. Y. 213;
*Honsinger* v. *Mulford,* 157 N. Y. 674.) The question of the
validity of the chattel mortgage was properly disposed of by
the court. ( *P. T. & S. Co.* v. *Schirmer,* 136 N. Y. 305.)

*Charles M. Williams* for respondents. The instrument in
question made in Michigan by the Elms Buggy Company, an
insolvent corporation, was repugnant to the laws and policy
of the state of New York, and the trustee Dearing obtained
no rights thereunder as against the McKinnon Dash and
Hardware Company, a creditor, attaching property of the
insolvent found in this state. He cannot successfully con-
test in our courts a claim lawfully levied here upon the prop-
erty of the Elms Buggy Company, by citizens of this state,
who have been induced to give credit to this foreign corpora-

tion. (*Barth* v. *Backus*, 140 N. Y. 230 ; *Leitch* v. *Hollister*, 4 N. Y. 211 ; *Dunham* v. *Whitehead*, 21 N. Y. 131 ; *Brown* v. *Guthrie*, 110 N. Y. 435 ; *Ginther* v. *Richmond*, 18 Hun, 232 ; *Jessup* v. *Hulse*, 21 N. Y. 168 ; *Hyslop* v. *Clark*, 14 Johns. 458 ; *Potts* v. *Hart*, 99 N. Y. 168 ; *Russell* v. *Winne*, 37 N. Y. 595.) As against the creditors of the Elms Buggy Company and this defendant, the instrument under which plaintiff claims is presumptively invalid, and the plaintiff has failed to establish its validity under the laws of the state of Michigan as against these defendants. (*M. Bank* v. *Boardman*, 47 Hun, 142 ; *People ex rel.* v. *Brady*, 56 N. Y. 182 ; *F. Nat. Bank* v. *F. Nat. Bank*, 77 N. Y. 320 ; *Buck* v. *Sherman*, 2 Doug. 176 ; *March* v. *Bennett*, 5 McL. 117.) The Statute of Frauds was available to the defendants. (*Reich* v. *Cochran*, 151 N. Y. 129.)

VANN, J. According to the law of the state of Michigan, which was duly proved upon the trial, the instrument in question is a trust mortgage upon chattels, because the transfer was not absolute, but conditional, and passed neither title nor right to possession until after breach of the condition. (*Cluett* v. *Rosenthal*, 100 Mich. 193 ; *Nat. Bank of Oshkosh* v. *First Nat. Bank of Ironwood*, 100 Mich. 485 ; *Austin* v. *First Nat. Bank of Kalamazoo*, 100 Mich. 613 ; *Warner* v. *Littlefield*, 89 Mich. 329.) If the transfer had been absolute, with the right to take immediate possession, it would, under the laws of Michigan, have been a general assignment and void, because a statute of that state prohibits preferences in documents of that character. (*Pettibone* v. *Byrne*, 97 Mich. 85 ; *Atkinson* v. *Weidner*, 79 Mich. 575 ; *Kendall* v. *Bishop*, 76 Mich. 634 ; 2 Howell's Annotated Statutes of. Michigan, §§ 6184, 6193, 6194, 6203 and 8739.) Although it was given to a trustee for the benefit of creditors, according to the law of the state where it was executed, it was as valid as if it had been given directly to the creditors themselves. (*Adams* v. *Niemann*, 46 Mich. 135, 137.)

Whether the coercive clause, the provisions relating to

the filing of a schedule of creditors by the mortgagor and the effect thereof, those permitting a continuance of the business with purchases and sales by the mortgagor, and those allowing the trustee wide latitude in selling, were established by evidence as valid by the law of the domicile of the mortgagor, we do not feel called upon to express an opinion. (*Albion Malleable Iron Co.* v. *First Nat. Bank of Albion*, 116 Mich. 218.) Judicial comity does not require us to enforce any clause of the instrument, which, even if valid under the *lex domicilii*, conflicts with the policy of our state relating to property within its borders, or impairs the rights or remedies of domestic creditors. (*Keller* v. *Paine*, 107 N. Y. 83, 89; *Warner* v. *Jaffray*, 96 N. Y. 248, 255.) A transfer in another state, although valid there, which would be void as to creditors if made here, does not confer title to personal property situated here that is good as against a resident of this state armed with legal process to collect a debt. (*Guillander* v. *Howell*, 35 N. Y. 657.) To this extent, in nearly all jurisdictions, the rule of comity yields to the policy of the state with reference to the collection of debts due to its own citizens, out of property within its boundaries and protected by its laws. (*Hallgarten* v. *Oldham*, 135 Mass. 1, 7; *Green* v. *Van Buskirk*, 72 U. S. 307, 312; *S. C.*, 74 U. S. 139, 150.)

The coercive clause of the mortgage in question required all creditors, before they could take any benefit therefrom, to come in under it and accept its terms, and, if their debts became due before the mortgage, to so extend the time of payment that they could not be enforced until after the mortgage matured. It not only withdrew from the trustee the power of paying any creditor who did not comply with these conditions, but also provided that after he had paid the creditors "in full who accept of this security and assent thereto," he was to pay the surplus to the mortgagor. The instrument was to "only operate in favor of those" so assenting, and the direction to pay was limited in the same manner. After payment, "in the manner aforesaid, and in the order aforesaid," the remainder was to go to the mortgagor, "its successors and

assigns." Thus, no creditor could derive any benefit from the mortgage unless he agreed to waive the remedies provided by law for the collection of debts, and if he refused to so agree all the property of the mortgagor was placed beyond his reach for an indefinite period. If his debt was due and he brought suit within the ninety days he was shut out from participation in the assets. If the mortgagor failed to include him in the schedule of creditors, which, although it was to be furnished at some undefined time after the execution of the mortgage, was, when furnished, to become a part of the instrument; or understated the amount of his claim ; or it was disputed by some other creditor or by the trustee, he could not establish it " by lawful suit," as provided by law, without running the risk of serious loss. He might wait until the ninety-day period had expired, or even until his demand had outlawed, and then find that he was not on the list.

The forced extension of the term of credit involved an abandonment, under compulsion, of all legal remedies for the collection of claims during the period of extension. This was an unreasonable exaction, in conflict with the policy and laws of our state, which opens the doors of its courts to enable creditors to collect their debts as soon as they fall due. A failing debtor in another state cannot compel a resident of this state to forego his right to the remedies afforded by our laws. He cannot by an agreement with a third party, made outside of this state, withdraw his property from the reach of legal process in this state, " in order to compel his creditors, under the apprehension of losing all their claims, to comply with a law of his own enactment." (*Marsh* v. *Bennett,* 5 McLean, 117, 126.) He cannot thus play upon the fears of his creditors in order to " coerce them into his own terms." (*Grover* v. *Wakeman,* 11 Wend. 187, 201 ; *Hyslop* v. *Clarke,* 14 Johns. 458.) While in the cases cited the coercive condition required a release of the debt in order to share in the fund, the principle is the same where the creditor is compelled to extend the time of payment, which is virtually a covenant not to sue, or be shut out entirely, for a debtor cannot constrain his

creditor to forego, by affirmative action, a right provided by law.

The claim of the attaching creditor became due about forty-five days before the mortgage, which was to run for ninety days. That creditor did not see fit to accept the privilege afforded by the mortgage upon the conditions imposed, and the necessary effect upon it and others similarly situated was that all the assets of the insolvent debtor would be converted into money and paid over to such creditors only as accepted the terms exacted, and whatever remained would be restored to the mortgagor. The hindrance and delay thus caused is precisely what the statute relating to fraudulent conveyances aims to prevent. A more adroit and dangerous method of evading that statute and violating its provisions has seldom been devised. An insolvent corporation, under the protection of this ingenious instrument, is permitted to keep possession of all its property, to continue its business, to buy, manufacture and sell " in the usual course of trade," which admits of sales on credit, and the creditors, whether preferred or unpreferred, unless they are willing to let this condition of affairs continue for ninety days, and tie their own hands by an extension of time for the payment of their debts, must lose all benefit from the mortgage and every chance of having their debts paid out of the assets of the mortgagor until a surplus, after paying all assenting creditors, should come back into its possession. There was not even a promise by the mortgagor to pay the proceeds of sales to the trustee, although the latter was " authorized and empowered to receive " them. Thus the mortgagor could keep its creditors at bay for ninety days, and continue in the possession and use of its property during that period. The inevitable result would be to hinder and delay creditors in violation of law.

The mortgage was void upon its face on account of the coercive provisions which it contained. Independent of those provisions, the peculiar circumstances presented a question of fact as to actual and intentional fraud on the part of the mortgagor. The device was clever, but the exceptional and extra-

ordinary facts laid the honesty of the debtor's purpose open to the judgment of a jury, who might find dishonesty and fraud, notwithstanding, as stated in an old statute, the "show of words and sentences, as though the same were made *bona fide* for good causes and upon just and lawful considerations." (27 Eliz. c. 4; 2 R. S. 137, § 4; *Russell* v. *Winne*, 37 N. Y. 591; *Smith* v. *Acker*, 23 Wend. 653; *Wood* v. *Lowry*, 17 Wend. 492.)

It is, however, claimed that the statute relied upon by the defendants affords them no protection, because they did not specifically plead it in their answer.  This statute, commonly called the Statute of Frauds, but not so entitled, consists of chapter 7, part second of the Revised Statutes, entitled "of fraudulent conveyances and contracts relative to real and personal property."  The provisions concerning fraudulent conveyances, which apply to every kind of property, are a re-enactment, with changes, of an ancient act, which is frequently, but not accurately, called the Statute of Frauds.  (1 R. S. part II, ch. VII, vol. II, p. 133 [9th ed. p. 1883]; 13 Eliz. c. 5.)  Those regulating the evidence necessary to establish certain contracts are a re-enactment, with changes, of a later "act for the prevention of frauds and perjuries," which is properly called the Statute of Frauds.  (29 Car. II, c. 3.)  The two statutes, which differ widely in origin and object, are now blended into one.  The earlier was little more than a codification of the common law with reference to transfers of property in fraud of creditors, while the later made a radical innovation upon the common law by establishing a new rule of evidence.

The established practice does not require a pleader to specifically refer to the provisions relating to fraudulent conveyances in an answer justifying the seizure of goods under legal process.  It is sufficient to allege that the goods levied upon were the property of the person against whom the process was issued, or that he had a leviable or attachable interest therein. Such is the form of the answer in the case before us, which we regard as sufficient without specific reference to the statute.  Those portions of the statute that are waived unless

pleaded, relate to contracts which, " although previously capable of valid proof by parol evidence," are declared to be void unless in writing. This, as it is held, creates a new defense, which must generally be pleaded, or the protection of the statute will be lost. The cases relied upon by the appellant are all of that class, and have no application to this appeal. (*Crane* v. *Powell*, 139 N. Y. 379; *Matthews* v. *Matthews*, 154 N. Y. 288; *Sanger* v. *French*, 157 N. Y. 213, 234.)

The order of the Appellate Division should be affirmed and judgment absolute rendered against the appellant, in accordance with his stipulation, with costs in all courts.

PARKER, Ch. J., GRAY, BARTLETT, MARTIN, CULLEN and WERNER, JJ., concur.

Order affirmed, etc.