# GEORGE W. COTHRAN

*v.*

## J. ALDER ELLIS *et al.*

*Filed at Ottawa May 9, 1888.*

1. WAGERS AND WAGERING CONTRACTS—*wagers at common law.* At common law, wagers not against the interests or feelings of third parties, or which would not lead to the introduction of indecent evidence to enforce them, or which are not immoral or contrary to public policy, were enforceable by action, as valid and binding obligations.

2. SAME—*wagering contracts—of their validity—dealing in "futures" or "options."* Under our legislation there can be no such thing as a valid wagering contract in this State, and he who advances money or other property to either of the contracting parties, to be used for such purpose, is equally guilty with the parties to the wager, and no action will lie against the borrower to recover it back.

3. Dealing in "futures" or "options," as they are commonly called, to be settled by the fluctuations of the market, is void by the common law, as being contrary to public policy, and as a crime against the State, etc.

4. APPEAL—*reviewing facts—for what purposes this court may consider the evidence.* While this court has no right to review the evidence for the

125   496
203   ⁴456
125   496
115a  ³551

purpose of determining whether it sustains the finding of the Appellate Court upon the controverted facts, yet such a review is proper when incidentally necessary to the determination of some question of law.

5. So where exception to the ruling of the trial court upon a demurrer to the evidence, or a motion to exclude it from the jury, or to find for one or the other of the parties, this court will be bound to examine the evidence. And, also, when an instruction is excepted to on the ground there is no evidence upon which to base it, this court will have to examine the evidence to see if the exception is well taken.

6. And when the question is made in the trial court whether there is evidence tending to prove the plaintiff's cause of action or a ground of defense, the ruling may be re-examined in this court, as presenting a question of law; but when not made in the trial court, this court can not look into the evidence to see whether it does tend to prove a given issue.

7. SAME—*and herein, what will constitute a finding of the facts in the trial court.* Whether evidence tends to prove an issue, is a question of law; but when admitted, the jury, under the instructions of the court, are to determine its force and effect on the issue; and whether the evidence is good, bad or worthless, their finding, based upon it, will be a finding of the facts involved in the issue, no matter whether the finding is justified by the evidence or not.

8. And where the defendant in an action upon a promissory note files special pleas, only, setting up the fact that the note was given upon a gambling contract, the burden of proof will be upon him; and if he offers no evidence in support of his pleas, it will be the duty of the jury to find the issues for the plaintiff, and such finding will be a finding as to the facts, and not reviewable in this court.

9. PLEADING AND EVIDENCE—*omission to give in evidence the instrument sued on.* On the trial of a suit upon a promissory note, the execution of which was not questioned, there being special pleas, only, going to the legality of its consideration, the note was present in court and identified, but not formally read to the jury: *Held,* that the failure of the record to show the giving of the note in evidence was not any ground for a reversal.

10. PRACTICE—*directing what the verdict shall be.* In an action upon a promissory note, where the proof shows no defense, the plaintiff is entitled to have the jury instructed to render a verdict against the defendant for the amount of the note, and it is error to refuse such an instruction.

11. SAME—*demurrer to evidence—motion to exclude.* Where the evidence fails to show any defense to a cause of action, the plaintiff may demur to the defendant's evidence, or ask the court to exclude it from the jury; and if the court refuses to allow the demurrer or to exclude the evidence, its ruling, if excepted to, may be reviewed by this court.

WRIT OF ERROR to the Appellate Court for the First District; —heard in that court on writ of error to the Superior Court of Cook county; the Hon. ELLIOTT ANTHONY, Judge, presiding.

Mr. FRANCIS A. RIDDLE, for the plaintiff in error.

Messrs. TRUMBULL & ROBBINS, and Mr. S. S. GREGORY, for the defendants in error.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

On the 23d day of June, 1885, the defendants in error, J. Alder Ellis and Milton C. Lightner, brought an action of assumpsit in the Superior Court of Cook county, against George W. Cothran, on the following instrument:

"$10,000.                          CHICAGO, *January 24, 1882.*

"Ninety days after date, I promise to pay to the order of Smith, McCormick & Co. $10,000 at their office, with interest from date until paid, at six per cent, value received.

GEORGE W. COTHRAN."

—Which was indorsed in blank by the payees, without recourse. To the declaration, which is in the usual form, the defendant interposed the plea of the general issue, which was subsequently withdrawn, and nine special pleas. A demurrer was sustained to the eighth, and issues of fact were joined on the others. The issues being thus made up, the defendant took the burden of proof, with the right to open and close. The substance of the defense presented by the pleas is, in general terms, that Cothran was speculating on the board of trade in grain and provisions; that his operations were conducted through Smith, McCormick & Co., members of the board; that they made on his account divers so-called purchases and sales of produce, provisions, etc., resulting in great loss to him; that the pretended purchases and sales were all colorable, and mere devices to cover up gambling transactions and wagers on the

run of the market; that they were violative of public morals, and in contravention of the Criminal Code of the State; that the note sued on was given, alone, for losses sustained by the defendant in these illegal transactions. The pleas present this defense with such variety of statement as to cover almost, if not quite, every conceivable illegal transaction contemplated either by the statute or the common law, and as there is no claim that they are not sufficiently broad in this respect, it would subserve no useful purpose to make a more particular statement of their general scope and contents. The trial in the Superior Court resulted in a judgment in favor of the plaintiffs for $12,460, which having been affirmed by the Appellate Court for the First District, the defendant brings the case here for review.

It is conceded that the plaintiffs hold the note sued on subject to all equities and defenses that could be made against it if the suit had been brought in the name of the payees. The question, therefore, in the trial court, was whether, under the proofs, the defendant was liable on the note to Smith, McCormick & Co., at the time of its transfer to the plaintiffs. Assuming the transactions set up in the pleas to be illegal, on the ground they were mere wagers respecting the grain and provision market, it is not important to inquire, with any degree of particularity, whether the case falls within the common law, which invalidates all contracts contrary to public policy, or whether it comes within the general statutory provisions against gaming, or whether it falls within the 178th section of the Criminal Code, which is directed exclusively against gambling in grain, stocks, etc., for the result would be the same in either case. On the other hand, if the transactions between the parties, as shown by the proofs, are not mere wagers, as alleged in the pleas, the judgment below is right, and should be affirmed.

By the common law, wagers not against the interests or feelings of third parties, or which would not lead to the intro-

duction of indecent evidence to enforce them, or which are not immoral or contrary to public policy, were enforcible by action as valid and binding obligations.    The tendency, however, of modern decisions is to enlarge the exceptions to the general rule which permits a recovery upon a wager, and some of the courts have gone so far as to deny the rule altogether.    *(Collamer* v. *Day,* 2 Vt. 144; *Amory* v. *Gilman,* 2 Mass. 1; *Babcock* v. *Thompson,* 3 Pick. 446; *Carrier* v. *Brannan,* 3 Cal. 328.) And in most of the States where the courts have not by judicial decision brought about this desirable reform, the legislature has.    Thus, it is declared in this State, by the 179th section of the Criminal Code, that "all promises, notes, bills, bonds, covenants, contracts, agreements, judgments, mortgages, or other securities or conveyances made, given, granted, drawn or entered into or executed by any person whatsoever, where the whole or any part of the consideration thereof shall be for any money, property or other valuable thing, won by any gaming or playing at cards, dice, or any other game or games, or by betting on the side or hands of any person gaming, or by wager or bet upon any race, fight, pastime, sport, *lot, chance, casualty,* election or unknown or contingent event whatever, or for the reimbursing or paying any money or property *knowingly lent or advanced* at the time and place of such play or bet, to any person or persons so gaming or betting, or that shall, during such play or betting, so play or bet, shall be void and of no effect."    It is clear, from this section of the statute, without regard to the common law, there can be no such a thing as a valid wagering contract in this State, and that he who knowingly advances money or other property to either of the contracting parties, to be used for such purpose, is equally guilty with the parties to the wager, and no action will lie against the borrower to recover it back.

The 178th section above referred to provides, that "whoever contracts to have or give to himself or another the option to sell or buy at a future time any grain or other commodity,

\*   \*   \*   shall be fined not less than $10 nor more than $1000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation shall be considered gambling contracts, and shall be void." According to the construction heretofore placed upon this section, the defense relied on, if satisfactorily established, would fall within its provisions. (*Pearce* v. *Foote*, 113 Ill. 228.) But leaving both sections of the statute cited entirely out of view, we are clearly of opinion that dealing in "futures" or "options," as they are commonly called, to be settled according to the fluctuations of the market, is void, by the common law, for, among other reasons, it is contrary to public policy. It is not only contrary to public policy, but it is a crime,—a crime against the State, a crime against the general welfare and happiness of the people, a crime against religion and morality, and a crime against all legitimate trade and business. This species of gambling has become emphatically and pre-eminently the national sin. In its proportions and extent it is immeasurable. In its pernicious and ruinous consequences it is simply appalling. Clothed with respectability, and entrenched behind wealth and power, it submits to no restraint, and defies alike the laws of God and man. With despotic power it levies tribute upon all trades and professions. Its votaries and patrons are recruited from every class of society. Through its instrumentality the laws of supply and demand have been reversed, and the market is ruled by the amount of money its manipulators can bring to bear upon it. These considerations imperatively demand at the hands of the courts of the country a faithful and rigid enforcement of the laws which have been ordained for the suppression of this gigantic evil and blighting curse.

The facts put in issue by the pleas, and upon which the rights of the parties depend, were clearly and distinctly alleged on the one side, and denied on the other. The parties, in the presence and under the direction of the court, submitted evidence to the jury upon the issues thus formed,—one to prove

the existence, and the other the non-existence, of the alleged facts. The jury found adversely to the appellant. Whether the evidence warranted the finding of the jury, presented another and distinct question, which the unsuccessful party had the right to have reviewed. He has availed himself of this right, first, by taking the opinion of the trial court, and secondly, that of the Appellate Court. Both these courts have found the facts the same way the jury did, and this would seem to be conclusive. It is urged, however, that there is no evidence to sustain these findings, and that this court must reverse the case for that reason, otherwise there would be a failure of justice. A moment's reflection ought to demonstrate the fallacy of this position. It is not a question of right or abstract justice, but it is a question of jurisdiction and power in this court to review a decision of the Appellate Court upon the facts. The legislature, in its wisdom, has given the Appellate Courts of this State exclusive jurisdiction over such questions, subject to certain limitations not affecting this case, and hence there is a total want of power in this court to interpose. There is no hardship in this which is not encountered in every case where the Appellate Court makes a wrong decision and no appeal is allowed to this, or when this court commits an error and there are no means of correcting it.

We might here dismiss this branch of the case without further remark, but for the fact it has been supposed that where there is no conflict in the evidence, and the proofs appear wholly insufficient to sustain the judgment of the trial court, this court, notwithstanding the affirmance of the judgment by the Appellate Court, may nevertheless reverse it, on the ground that the want or insufficiency of the evidence to support the judgment presents a question of law to be reviewed here. This position is unsound, in any view that may be taken of it. It is true, that whether a matter offered in evidence tends to prove an issue, presents, when challenged, a question of law for the determination of the court. But when once admitted,

the jury, under the instructions of the court, are to determine its force and effect upon the issue submitted, and pass upon the issue itself as one of fact, and no review of it, by this or any other court, can change it to one of law. And whether the evidence is good, bad or worthless, the finding of the jury based upon it will be a finding of the facts involved in the issue, within the meaning of our statute, without regard to whether it is justified by the evidence or not; and if the jury have made a mistake, the ultimate power to correct it is conferred upon the Appellate Court, and not upon this.

By the 89th section of the Practice act, the legislature has declared that "the Supreme Court shall *re-examine* cases brought to it by appeal or writ of error, as to questions of law, only." But it is said, that whether there is evidence tending to prove the plaintiff's cause of action, or the defendant's grounds of defense, presents a question of law for the determination of the court. That is true if the question is made. But suppose neither of the parties raises the question, and the court is not asked to make,—and in fact does not make,—any ruling upon it, is it not manifest this court could not pass upon it, except as an original question raised for the first time in this court? And if it undertook to do so, is it not equally clear it would be exercising original and not appellate jurisdiction? To say this may be done, is to confound all distinction between appellate and original jurisdiction, and to utterly disregard the express words of the statute above cited. This court, it will be perceived, when we look to its grant of appellate jurisdiction, is authorized to "*re-examine* cases  *  *  * on questions of law, only." Is no significance to be attached to the word *re-examine?* How can this court, with any propriety of language, be said to re-examine a question, on appeal, which was not raised or passed upon by the lower court? But outside of the significant language of the statute, it is clear the proper and only function of this court, sitting as a court of review, is to correct the errors *assigned* upon the record. What errors?

Manifestly, errors alleged to have been committed by the lower court whose judgment is to be reviewed. The very form of an assignment of error, which is almost as old as the law itself, proves this.

The supposed hardships that might now and then occur in exceptional cases by adhering to these well settled rules of procedure, are more apparent than real, and would never happen at all except through the culpable negligence of counsel, for which the latter would be answerable to his client in damages. Take the case, for instance, of an action on a promissory note, to which the proofs show no defense whatever, nevertheless judgment is given for the defendant. When the evidence is all in, the plaintiff is entitled to have the jury instructed to render a verdict against the defendant for the amount of the note, and if the court, when asked, should refuse to so instruct, it would be reversible error. But this right, like most others arising in the progress of a trial, may be waived,—and would be, by failing to have the court pass on the question. Or the plaintiff might formally demur to the defendant's evidence, or ask the court to exclude it from the jury; and if the court refused to allow the motion or sustain the demurrer, as the case might be, its ruling, if excepted to, would be reviewable here. So if the court should give an instruction directing the jury to find for the defendant upon any hypothesis, and the plaintiff should except to it, the same question would be raised, and this court would reverse the judgment on the ground it is always error to give an instruction where there is no evidence upon which to base it. If, however, the plaintiff should close his eyes to all these modes of raising the question, either of which would entitle him to have it reviewed in this court, he would have no more cause to complain than one who loses his case here, because his attorney, in the court below, failed to take an exception to some erroneous ruling on the trial, which, if taken, would have been cause for reversal in this court,—a matter of almost every-day occurrence.

While this court has no right, as we have seen, to review the evidence for the purpose of determining whether it sustains the finding of the Appellate Court upon the issuable or controverted facts, yet such a review is entirely proper when incidentally necessary to the determination of some question of law, and it is the constant practice of this court to do so. Thus, where an exception is taken to the ruling of the trial court upon a demurrer to the evidence, or a motion to exclude it from the jury, or to find for one or the other of the parties, this court would be bound to examine the evidence in order to determine the propriety of the ruling of the court below. So where an instruction is excepted to, on the ground that there is no evidence upon which to base it, this court will have to examine the evidence in order to determine whether the exception is well taken.

The view here presented conforms to the rulings of this court upon analogous questions, and is in complete accord with the common law rules of pleading and practice, which, in the main, are a part of the positive law of the State. Not only so, but this court, if such a thing be possible, is irrevocably committed to such view by oft-repeated decisions directly upon the question, as is abundantly shown by the following cases: *Wallace et al.* v. *Goold*, 91 Ill. 15; *Bridge Co.* v. *Comrs. of Highways*, 101 id. 518; *Capen et al.* v. *De Steiger & Co.* 105 id. 185; *Edgerton* v. *Weaver et al.* id. 43; *Baird et al.* v. *Trustees of Schools*, 106 id. 657; *Brown* v. *City of Aurora*, 109 id. 165; *Hardy* v. *Rapp*, 112 id. 359; *Indianapolis and St. Louis Railroad Co.* v. *Morgenstern*, 106 id. 216; *Chicago, Burlington and Quincy Railroad Co.* v. *Bell*, 112 id. 360; *Williams* v. *Forbes*, 114 id. 167; *Insurance Co.* v. *Barrel Co.* id. 99; *Rogers* v. *Chicago, Burlington and Quincy Railroad Co.* 117 id. 115.

We can not stop to call attention to the emphatic and unequivocal language of the court in the cases cited, for the purpose of demonstrating its position on this question, for to do so would extend the discussion beyond all reasonable limits.

Whatever may be found in any of the cases not in accord with what is here said, is not approved, and must be regarded as overruled.

The facts alleged in the defendant's pleas, and put in issue by the plaintiffs' traverse, are the only controverted facts in this case, and the *onus probandi* was upon the defendant. If the latter had offered no evidence at all, it would not have been necessary for the plaintiff to offer any, for the jury are always bound to find the facts against the party having the burden of proof, if he offer no evidence in support of the issues. Nevertheless, the finding of the facts, under such circumstances, is, in legal effect, precisely the same as in any other case. The facts as found, whether with or without evidence, can be the only basis of relief, so long as the finding remains in full force and effect. Accepting, then, as we do, the decision of the Appellate Court as a finality upon the controverted facts raised by the issues, it will be necessary to briefly advert to the evidence, for the purpose of passing upon the questions of law arising on the record.

The dealings between Cothran and Smith, McCormick & Co. commenced on the 1st day of November, 1881, and closed on the 24th of February, 1882. During this time,—a period of three months and twenty-four days,—the latter rendered to him thirty-nine statements, showing the number of purchases and sales of grain, provisions, etc., purporting to have been made by them on his account. They show, all together, one hundred and forty-four sales, and exactly the same number of purchases. For every sale there appears a purchase of a like article or commodity, corresponding exactly in quality and quantity with that of the sale. Each sale, with its corresponding purchase, often appears to have been made on the same day, and, as a general rule, was promptly followed by a statement of the transaction, in which appellant was charged or credited, as the case might be, with the difference between the buying and selling price. These statements do not, in a single

instance, give the name of the party with whom appellant is alleged to have been dealing. Neither is this shown by any of the books of Smith, McCormick & Co. now in existence; nor are any of the members of that firm, or any one else, so far as this record shows, able to name a single buyer or seller with whom that firm was dealing on appellant's account. It is true, McCormick states that the company did have books showing the parties with whom they were dealing on Cothran's account, but it is claimed that these books were either destroyed by the firm or sold as old paper. This claim of the willful destruction of the books, to say the least of it, is far from strengthening the case of appellees. *Omnia præsumuntur contra spoliatorem.* · The above mentioned statements, for the short period stated, show sales and purchases on appellant's account of 5000 barrels of pork, 2500 tierces of lard and 1,850,000 bushels of grain, of the total value of $2,504,825.75, on which transactions Cothran paid Smith, McCormick & Co., in margins, $7500. On the evening of the 23d of January, 1882, the latter, in the technical language of the trade, "closed out all of his deals," and on the following morning there was a settlement between them of all transactions up to that date. The account, as stated, after giving appellant the benefit of all credits, showed a balance against him of $25,881.25, which, for purposes of payment, was divided into three installments, and Cothran gave his notes therefor, one of which is the note now in suit. The appellant is a lawyer by profession, and notwithstanding his alleged heavy purchases from unknown sellers, he swears he never owned a bushel of wheat in his life. During the time these transactions were going on between him and Smith, McCormick & Co., it is not pretended that he received from them a cent of money, or any grain, property or produce alleged to have been purchased by him. Nor is it claimed that he ever delivered, or was called on to deliver, any produce or property charged to have been sold by him, nor was he ever offered or tendered anything claimed to have been

purchased by him.   McCormick, on being asked whether he
had ever delivered any property bought by his firm, to Judge
Cothran, replied: "I don't know whether we did or not,—*that
was a matter that rested entirely with him, as to whether he would
receive property or not.*" In the language of the same witness,
appellant was always "on the option side of the deal." No
cash produce was ever bought or sold. All sales and purchases
provided for delivery at a future day. That time, however,
never even once arrived in the whole two hundred and eighty-
eight transactions, and from the uniform method of conducting
the business, it is almost an irresistible conclusion that it was
not contemplated or intended by either of the parties that it
ever should arrive.

Such is the general outline of the case made by the evidence.
Much detail might be added which would still strengthen the
case against appellees; but that is not important, as we have
no power to relieve the appellant from what we may regard
as an improper finding of the facts by the Appellate Court.

We come now to the questions of law presented by the record.
Numerous exceptions were taken to plaintiffs' instructions, but
we can not stop to consider them in detail, or answer the argu-
ments of counsel respecting them. Assuming that there is
sufficient evidence upon which to base them, suffice it to say,
in general terms, we see no substantial objections to them.
Neither do we think the court committed any material error
in its rulings upon the defendant's instruction.

The only question about which we have had any serious
doubt is, whether the evidence favorable to appellees was suf-
ficient to warrant the court in submitting the cause on their
behalf, upon instructions of any kind. Appellant's counsel
earnestly insists that there is no conflict in the evidence,—
that it fully sustains the defense, and that there is no proof
upon which the contrary hypothesis can rest. If this claim is
well founded, it is clear the trial court erred in submitting the
case on instructions for appellees, and this, as just remarked,

is the controlling question in the case. We have carefully examined the evidence in its bearing upon this aspect of the case, and however much dissatisfied we might be with the finding of the lower courts upon the facts in issue, we are unable to say, with appellant, there is no evidence in the record to support the finding in favor of appellees. Upon a very careful consideration of the evidence submitted in their behalf, we think, when taken by itself,—and that is the proper way to test the question,—it is sufficient to sustain the finding of the lower courts.

We do not think there is anything in the point that the note sued on was not formally read to the jury. Subject to the matter set up in the pleas, the cause of action was confessed. The note was present in court, and was identified in the presence of the jury, and its amount stated, and there is no claim, in the pleadings or otherwise, that anything was ever paid upon it. This, we think, was sufficient to warrant the jury in assessing the damages at the face of the note, with interest, as they did.

The judgment will be affirmed.

*Judgment affirmed.*


Mr. CHIEF JUSTICE SHELDON concurs in the result, but not in all that is said in the opinion.

Mr. JUSTICE CRAIG: I concur in affirming the judgment, but I am not satisfied with the reasoning in the opinion.

Mr. JUSTICE SHOPE: I dissent from the finding and conclusion reached by the majority of the court.