BOARD OF TRADE OF CITY OF CHICAGO v. DONOVAN COMMISSION CO. et al.

SAME v. CELLA COMMISSION CO. et al.

(Circuit Court, E. D. Missouri, E. D. April 6, 1903.)

Nos. 4,370, 4,371.

1. BOARD OF TRADE—PROPERTY IN QUOTATIONS—INJUNCTION—GAMBLING CON-
    TRACTS.

   Where it was proved that over 90 per cent. of the transactions executed in the pits of a board of trade were mere gambling transactions, which both parties intended to settle by a payment of differences in the subsequent price of the commodities dealt in before the maturity of the option, quotations so obtained were of no legitimate value as tending to promote the commerce of the country, and dissemination thereof could not be restrained by such board of trade.

Henry S. Robbins and Boyle, Priest & Lehmann, for complainant.
Chester H. Krum, Dickson & Smith, Johnson & Richards, and H. A. Loevy, for defendants.

ADAMS, District Judge. There are separate records in these cases, but both present practically the same issues, and are determinable by practically the same proof, and will, therefore, be considered together. These are bills for injunction to restrain the commission companies from receiving or using certain market quotations known as "continuous," claimed to be the property of the complainant. It is charged that the complainant is a commercial exchange, wherein is conducted daily by its members a great volume of business in buying and selling grain and hog products for present and future delivery; that the quotations of the prices made in such transactions constitute a valuable property, which complainant utilizes by licensing certain telegraph companies, for consideration paid to it, to distribute them among their patrons and customers; that such quotations are furnished to the telegraph companies under contracts prohibiting them from distributing the same to any persons conducting a "bucket-shop" business; that the defendants in these cases are engaged in that business; and that they and each of them are

surreptitiously acquiring these "continuous quotations" emanating from complainant's exchange, either from the telegraph companies or through some other agencies, without the consent of the complainant or of the telegraph companies, in violation of the contract existing between complainant and such companies, thereby subjecting complainant to irreparable damage. The main facts controlling these cases are stated and much of the evidence now before me is set out in the case of Board of Trade v. O'Dell Commission Company (C. C.) 115 Fed. 574, to which reference is made for a more complete statement of the present cases and of the evidence controlling their determination.

The argument of counsel took a wide range, and embraced many questions, namely, whether complainant itself, as distinguished from its members, has any property right in the quotations; whether, if it had, complainant has not, by a long course of dealing, so devoted the same to public use without charge that it is not now permitted to assert a monopoly thereof; and whether complainant's business out of which the quotations arise is not so violative of the laws of the state of Illinois as to constitute a criminal offense against such laws, etc. But, in the view taken of this case by the court, it is not necessary or material to pass upon many of these questions. The main question argued, and the one which underlies the whole case, is whether the property right, whatever complainant may have in the "continuous quotations" in question, is so tainted with immorality as to preclude resort to a court of equity by the complainant for its protection. After careful consideration of the proof, it is found that the "continuous quotations" in question result largely from wagering on the future price of grain and hog products by the members of the board of trade operating in the "pits" on the floor of the exchange. I am satisfied by the proof that a very large per cent. of the so-called "sales for future delivery" which furnish the basis of the quotations in question are mere gambling transactions, involving no purpose on the part of the seller to deliver and no purpose on the part of the buyer to receive the subject of sale, but rather involving the mere purpose of settling at or before the date of assumed delivery the difference between the alleged contract price and market price. It makes little difference that the rules of the exchange subject to which all transactions are required to be made provide that no fictitious sales shall be made, and that all transactions must amount to "a bona fide purchase and sale of property for actual delivery." Courts of equity look beyond the forms of things, and will not permit suitors to screen themselves behind the form and semblance of the transaction, and escape a consideration of its essential quality. The proof shows that largely over 90 per cent. of all the transactions in the "pits," which alone determine the "continuous quotations" which are sent out over the country, are in fact closed out by a settlement of differences, and that actual deliveries of the article bought or sold are rarely ever made. This practice relates to the transaction in the "pits" on the floor of the exchange, where trades for alleged future delivery are made, and has no relevancy to the cash or real transactions in wheat and provisions for consumption or ex-

port, which are conducted in another part of the exchange. The fact just alluded to that deliveries are rarely, if ever, actually made in cases of sales in the "pits" for future delivery, and the great weight of evidence bearing on the issue, leads me irresistibly to the conclusion that no deliveries in such cases are intended or contemplated by either party. It is a time-honored maxim of the law that every person must be held to have intended the reasonable and usual consequences of his acts. The property, therefore, which the complainant asks this court to protect by its injunctive process is the right to monopolize the speedy dissemination of information instructing the public what wagers are being made on the future price of grain and other commodities by the members of Chicago Board of Trade. Information of the prices made in other parts of the exchange on grain and other provisions for actual consumption or export, or even for the purposes of holding for speculative profit in cases where the grain or other provisions are delivered in fact, or are intended to be delivered, might, and undoubtedly would, be very valuable to the public, and such information would promote legitimate trade and commerce; but the other kind of information, conveying intelligence as to the wagers that are made in the "pits," in my opinion has no legitimate tendency to promote the commerce of the country, but, on the contrary, tends only to excite the gambling propensities of the public. Such is not a species of property which appeals to a court of conscience for protection.

The bills in both these cases must be dismissed.