CHRISTIE GRAIN & STOCK CO. et al. v. BOARD OF TRADE OF CITY
OF CHICAGO (two cases).

(Circuit Court of Appeals, Eighth Circuit.   October 8, 1903.)

Nos. 1,805, 1,911.

1. EXCHANGES—PROPERTY RIGHT IN QUOTATIONS—PROTECTION IN EQUITY.
    The Board of Trade of Chicago is not entitled to invoke the aid of a
    court of equity to protect its claimed property right in the quotations
    made on the transactions of its exchange, under proof which shows that
    at least 85 per cent. of such transactions are deals in which it is not in-
    tended to make a future delivery of the article nominally dealt in, but
    which are to be settled by the payment of money only according to the
    fluctuations of the market, and that for a specified price it furnishes
    such quotations to telegraph companies for distribution as a means of
    encouraging speculation in futures, and for the purpose of bringing such
    business to its members; both the permitting of such transactions, and
    the sending out of such quotations for the purpose stated, being in viola-
    tion of the statutes of the state, as construed by its Supreme Court.

Appeals from the Circuit Court of the United States for the West-
ern District of Missouri.

For opinions below, see 116 Fed. 944, and 121 Fed. 608.

James H. Harkless, John O'Grady, Charles S. Crysler, W. H. Ros-
sington, Charles Blood Smith, and Clifford Histed, for appellants.

Henry S. Robbins, for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and
SHIRAS, District Judge.

SHIRAS, District Judge.   On the 18th day of April, 1901, the
Board of Trade of the city of Chicago filed in the Circuit Court of
the United States for the Western District of Missouri a bill in equity
against the Christie Grain & Stock Company, a corporation created
under the laws of the state of Missouri, C. C. Christie, the Western
Union Telegraph Company, the Postal Telegraph Cable Company,
and the Gold & Stock Telegraph Company, the three companies last
named being corporations created under the laws of the state of New
York; the relief prayed for in the bill being the granting an injunc-
tion restraining the Christie Grain & Stock Company and C. C.
Christie from receiving or surreptitiously acquiring from the tele-
graph companies certain market quotations representing the dealings
had on the Board of Trade in the city of Chicago, and restraining
the telegraph companies from entering into any contracts with the
Christie Company or C. C. Christie for the delivery to them of the
quotations furnished the telegraph companies by the complainant.

As grounds for asking the relief prayed for, it is averred in the
bill that the complainant is a corporation created by a special char-
ter granted by the Legislature of the state of Illinois on the 18th
of February, 1859, with authority "to maintain a commercial ex-
change; to promote uniformity in the customs and usages of mer-
chants; to inculcate principles of justice and equity in trade; to
facilitate the speedy adjustment of business disputes; to acquire and
disseminate valuable commercial and economic information and

125 F.—11

generally to secure to its members the benefits of co-operation in the furtherance of their legitimate pursuits"; that there are about 1,800 members of the Board of Trade; that the corporation has provided in the city of Chicago an exchange building, which cost upwards of $1,000,000; that there is provided within this building, for the exclusive use of the members, an exchange hall, where many of its members meet every business day to buy and sell for themselves, or as brokers for their customers, for present and future delivery, all kinds of grain and hog products, the value of said transactions aggregating many million bushels of grain and many million pounds of hog products annually, and having become so large that said exchange is one of the great grain and provision markets in the United States; that such transactions are permitted only during market hours, and by open, viva voce bidding; that the knowledge of the prices thus made on said transactions during market hours upon the exchange has become a species of property of large value, for which the telegraph companies are willing to pay large sums to the Board of Trade, in order that they may secure the same promptly, with the privilege of selling the same to their customers; that on the 15th of April, 1901, the complainant entered into a written contract with the Western Union and Postal Telegraph Companies, whereby it agreed to furnish to the telegraph companies complete and continuous quotations of prices made in transactions between members of said Board of Trade in its exchange hall, the telegraph companies agreeing to pay a certain price therefor, and also agreeing that they would not knowingly furnish or sell, directly or indirectly, the continuous quotations furnished them to any person, firm, or corporation conducting a bucket shop or other similar place where such quotations are used as a basis for bets or other illegal contracts, based upon the fluctuations of the prices of commodities dealt in on said Board of Trade, there being set forth in the written contract a form of application which the persons desiring to receive from the telegraph companies the quotations furnished by the Board of Trade were required to sign as a prerequisite to obtaining the same; that the Christie Grain & Stock Company and C. C. Christie, doing business at Kansas City, Mo., have not signed any such applications, and have not entitled themselves to rightfully receive and use the designated quotations, but without right and surreptitiously have obtained and used these quotations to the great injury of the complainant, and have demanded of the telegraph companies that they shall furnish the quotations to the said Christie Company without the latter signing the application prepared by the complainant or agreeing to its terms.

To this bill the Christie Company and C. C. Christie filed an answer and an amended answer, in which it is, in substance, claimed that the business transacted in the exchange hall of the Board of Trade is of a public nature, and that the Christie Company and all other parties engaged in dealing in grain and hog products are entitled to the knowledge and use of these quotations; that the Western Union Telegraph Company is a public corporation engaged in business as a common carrier, and as such is under obligation to furnish these quotations, when sent over its wires, to any party desiring the

same, upon payment of the proper cost thereof; that the effort of the Board of Trade and of the telegraph company to limit the delivery of the quotations is in restraint of trade, and is a violation of the act of Congress known as the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]); that the quotations sent out by the telegraph company are not the private property of the Board of Trade, in such sense that the Board of Trade can rightfully confine the knowledge thereof to such persons as will subject themselves to the terms of the application contracts; that such attempted restriction in the use of these quotations tends to create a monopoly in the articles dealt with on the Board of Trade, and that the Board of Trade is not entitled to the aid of a court of equity in securing to itself the pecuniary benefit derived from the sale of the quotations, because the same represent or grow out of transactions had in the exchange hall of the Board of Trade, which are in violation of the statutes of the state of Illinois and of the state of Missouri, prohibiting any person or corporation keeping or causing to be kept any bucket shop, office, or place wherein is permitted the pretended buying or selling of cotton, grain, provisions, and other articles without any intention of receiving and paying for the property so bought, or of delivering the property so sold, or wherein is permitted the buying or selling of any such property on margins, it being further therein enacted that any corporation, association, copartnership, or person who shall communicate, receive, exhibit, or display in any manner any such offer to buy or sell, or any statements or quotations of the prices of any such property, with a view to any such transactions, as aforesaid, shall be deemed an accessory, and be liable to be fined and punished as provided for in the act.

The telegraph companies did not answer the bill, and the questions at issue are those presented by the bill and the answers of the Christie Company and C. C. Christie.

A large amount of testimony was taken, and the case was finally submitted to the Circuit Court upon the pleadings and proofs, which court found in favor of the complainant, granting it a decree as prayed for; the opinion of the court being reported in 116 Fed. 944.

From the finding and decree of the circuit court the Christie Company and C. C. Christie have appealed to this court, and counsel for the adversary parties have submitted the case upon full and elaborate briefs.

We deem it advisable to first consider the question whether the quotations of prices, which it is the purpose of the bill to prevent being delivered or furnished by the Western Union Telegraph Company to the Christie Company, grow out of transactions had 'in the exchange hall of the Board of Trade, of such a nature that they come within the condemnation of the statute of Illinois quoted in defendants' answer, the first and second sections of which are as follows:

"That it shall be unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this state, any bucket shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or

petroleum, cotton, grain, provisions or other produce, either on margins or otherwise, without any intention of receiving and paying for the property so bought, or of delivering the property so sold; or wherein is conducted or permitted the pretended buying or selling of such property on margins; or when the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold; and the keeping of all such places is hereby prohibited. And any corporation or person, whether acting individually or as a member or as an officer, agent or employé of any corporation, association or co-partnership, who shall be guilty of violating this section shall, upon conviction thereof, be fined in any sum not less than $200 and not more than $500; and any person or persons who shall be guilty of a second offense under this statute, in addition to the penalty above described, shall, upon conviction, be imprisoned in the county jail for the period of six months, and if a corporation, shall be liable to forfeiture of its charter. And the continuance of such establishment after first conviction shall be deemed a second offense."

"It shall not be necessary, in order to commit the offense defined in section 1 of this act, that both the buyer and the seller shall agree to do any of the acts therein prohibited, but the said crime shall be complete against any corporation, association, co-partnership or person thus pretending or offering to sell, or thus pretending or offering to buy, whether the offer to sell or buy is accepted or not; and any corporation, association, co-partnership or person who shall communicate, receive, exhibit or display, in any manner, any such offer to buy or sell, or any statements or quotations of the prices of any such property, with a view to any such transaction as aforesaid, shall be deemed an accessory, and, upon conviction thereof, shall be fined and punished the same as the principal, and as provided in section one of this act."

In Soby v. People, 134 Ill. 66, 25 N. E. 109, the Supreme Court of Illinois, in construing this statute, held as follows:

"In construing a statute the primary consideration is to ascertain and give effect to the legislative intention. In order to accomplish this object the court should look at the whole act, and seek to ascertain such intention by an examination and comparison of its various provisions. Mason v. Finch, 2 Scam. 223; People v. Commissioners, 3 Scam. 153; Perteet v. People, 65 Ill. 230. The court may also consider other and prior acts relating to the same general subject, and thus ascertain what mischiefs the later legislation was designed to remedy, and the true spirit and import of such legislation. Stribling v. Prettyman, 57 Ill. 371. By the Revised Criminal Code of 1874 (Rev. St. 1874, p. 372, c. 38, §§ 130, 131) it was made a criminal offense to contract to have or give the option to sell or buy, at a future time, any grain or other commodity, etc., and it was provided that all contracts made in violation of such law should be considered gambling contracts, and should be void. It was held under that statute that, even though a contract purported upon its face to be an absolute contract for the sale or purchase of grain or other commodity for future delivery, yet the transaction would be a gambling contract, within the prohibition of the statute, if the real intention of both parties at the time of making the contract was to deal only in options, and make future settlements upon the basis of the difference in the market price, without the actual delivery of the grain or other commodity sold or purchased. But it was also held, under the same statute, in numerous cases, that, if either party contracted in good faith, the contract was a valid and binding contract, no matter what might have been the secret intention of the other party. It is manifest that the object of the statute was to suppress and prevent gambling in grain and other commodities. But so great was the difficulty of establishing the unlawful intent of the parties making illegal contracts, so many were the shifts and devices resorted to for the purpose of concealing the true character of the gambling transactions entered into, that the statute was found to be ineffectual to accomplish the purpose for which it was enacted. It is a matter of common notoriety that, notwithstanding the highly penal character of the statute of 1874, the evil it was aimed at continued to increase with wonderful rapidity throughout the state, until in almost every city or town of any considerable importance commission houses, offices, or

agencies were established, in which the great bulk of the business transacted was the making of contracts which, while legitimate upon their face, were in fact mere gambling transactions, which were never allowed to mature, but were uniformly adjusted before maturity upon differences in market price, and without any actual delivery of the articles which were the subject-matters of such pretended contract. To remedy the mischief, the Legislature, satisfied with the futility of attempting to suppress gambling in grain and other commodities by striking merely at the gambling contracts themselves, and the parties entering into such contracts, has sought, by the statute of 1887 (Laws 1887, p. 96), to suppress all bucket shops, offices, stores, or other places wherein gambling in grain or other commodities is conducted or permitted, and to do this by punishing, by fine, imprisonment, or forfeiture of charter, any person, co-partnership, association, or corporation that keeps or causes to be kept a place of that character within the state, and also punishing by fine of not less than $500, nor more than $1,000, the owner of any building who knowingly permits on his premises any of the illegal acts denounced by the statute. It would seem clear from the evidence that the plaintiff in error kept an office or place wherein was 'conducted or permitted' the buying or selling of grain or other produce on margins, 'without any intention of receiving and paying for the property so bought, or of delivering the property so sold,' and wherein was 'conducted or permitted the pretended buying or selling of such property on margins,' and where the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold.

"A consideration of the act will, as before indicated, show that it is directed against the keeping of any office or place, etc., first, wherein is conducted or permitted the pretended buying or selling of grain or other produce on margins, or otherwise, without any intention of receiving the property bought, or delivering it if sold. Under this clause of the first section the offense consists in keeping the place, etc., where such buying or selling is conducted or permitted. That plaintiff in error kept the place or office is conceded; and that buying or selling upon margins, without any intention on the part of the customer to receive the thing bought, or to deliver the thing sold, was permitted in such office or place so kept by the plaintiff in error, is also substantially conceded, and, if it were not, is abundantly proved. Under this provision of the act the keeper of such office, or place, etc., cannot shield himself from criminal responsibility behind the fact that he made no inquiry of his customers. The statute is preventive in its character, and is aimed at the keeping of places where gambling in grain is permitted. The keeper must know that the transaction is not gambling, or in good faith have just reason to believe that the buying or selling is not within the intended prohibition of the statute. But if this were not so, there is abundant evidence in this record to show that the plaintiff in error knew that his customers did not contemplate an actual delivery of the commodity bought or sold. Again, the second clause makes it an offense to keep a place, etc., wherein is conducted or permitted the pretended buying or selling of such produce on margins. It is scarcely contended that the customer did not in fact intend only to purchase options, and to make money in the rise and fall of the markets, without any expectation of receiving or delivering grain. In other words, it is too plain for argument that the buying and selling of grain was a mere pretense, at least so far as the customer was concerned. Again, the third clause creates the offense where the party buying such produce, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold. Here the proof established beyond question that purchases were made without any intention of receiving the commodity purchased. The only object was to make money on the fluctuations of the market by the pretended purchase of the grain on margins. * * * Nor can the fact that Lindbloom & Co. may have gone into the Board of Trade, and made like contracts of purchase or sale, avail plaintiff in error. As before said, the act is intended to prevent the keeping of places where gambling in grain is conducted or permitted. If the employers of plaintiff in error, in order to protect themselves, made, even in good faith, purchases or sales of like amounts of grain or produce, it would not change the nature of the trans-

action which had transpired between plaintiff in error and his customer, so as to free it from the taint of gambling, since, in respect of such customer, it would still be a mere gambling on margins—a mere speculating on the rise and fall of the market. It is apparent from the whole act, from the title to the concluding sentence, that the purpose and object of the Legislature was to suppress the evil of gambling in produce. Primarily, it was intended to reach and suppress the bucket shop and bucket-shopping, from which much of the evil sought to be corrected necessarily flows. But it is manifest that, probably owing to the difficulty of securing conviction where all the elements to constitute a bucket shop, or the practices of bucket-shopping, as the same have been defined in the decisions of the courts, are required to be established, the Legislature saw proper to strike a fatal blow at both bucket shops and bucket-shopping, by prohibiting the keeping of all offices, places, etc., where gambling in grain and other produce is carried on or permitted. There can be no question but that the evil of gambling in futures was present in the business carried on by plaintiff in error. There is in the evidence even just ground for the conclusion that it was present, to all intents and purposes, as fully as if his office had been denominated, a 'bucket shop,' instead of an 'agency' or a 'commission house.' The shifts and devices so easily and frequently resorted to for the purpose of giving to transactions tainted with gambling the semblance of legitimate deals were sufficient considerations, in the legislative judgment, to require, as a matter of public policy, that all places wherein is conducted or permitted the pretended buying or selling of property, such as is specified in the act, on margins or otherwise, shall be prohibited. If two firms, members of the Board of Trade, could be found, who were willing to enter into such a scheme, it is manifest that one firm representing agencies in half of the commercial centers in the state, and the other representing the other half, could buy or sell to fill the orders of their respective agents, from each other receive the margins, and 'wring out their deals' without a bushel of grain or pound of any other commodity changing hands. Yet, if either demanded the grain or other product of the other, the contract would be so drawn as to be a valid sale and purchase of the produce itself; and they could, without legal perjury, testify that it was to be delivered if desired by the party entitled to it under the contract. By such means the state would still be subject to all the evils of the bucket shop and bucket-shopping.

"We are not permitted, by the rules of construction, to extend the body of the act by reference to its title, which is, 'An act to suppress bucket-shops, and gambling in stocks, bonds, petroleum, cotton, grain, provisions, and other produce,' but we may consider it for the purpose of determining what was within legislative contemplation. Perry Co. v. Jefferson Co., 94 Ill. 214. The Legislature by the fourth section, as we have seen, declares that it is the intention of this act to prevent, punish, and prohibit within this state the business now engaged in and conducted in places commonly known and designated as 'bucket shops,' and also to include the practice now commonly known as 'bucket-shopping,' etc. To accomplish this purpose the Legislature has prohibited the keeping of the places where what is commonly known as 'bucket-shopping' is carried on. They have not in the body of the act prohibited the keeping of bucket shops, or the practice of bucket-shopping, only, but have included the keeping of every place wherein is conducted or permitted the gambling in grain or other produce, and have expressly provided that it shall not be necessary, in order to commit the offense, that both the buyer and seller shall agree to do any of the acts therein prohibited. By the act the mere offer of the corporation or person keeping such place to make such pretended sale or purchase, whether the offer to sell or buy is accepted or not, renders the offense complete against such corporation or person. Such corporation or person is also prohibited from communicating, receiving, exhibiting, or displaying in any manner any such offer to buy or sell, or any statement or quotation of the prices of such property, with a view of any transaction of the kind prohibited. Moreover, as we have already seen, the person who knowingly permitted any of the acts prohibited by the statute in any house or place owned by him is subjected to heavy penalty. It is apparent, we think, that the Legislature, for the purpose of carrying into effect their

expressed intention of preventing the evils resulting from bucket shops and bucket-shopping, and to suppress the vice of gambling in grain and other produce, so detrimental to the interests and welfare of the people, have determined to close, suppress, and prohibit the keeping of places where the practice of bucket-shopping or gambling in such commodities is permitted. No other construction of the act would be consistent either with its letter or spirit. We are of opinion that it is no longer possible, in this state, under any shift or device, however specious, to keep an office or other place where parties may, under the pretense of buying or selling grain or other produce, engage in speculation in futures, and gamble upon the rise and fall of the market. * * *"

In Clews v. Jamieson, 182 U. S. 461, 494, 21 Sup. Ct. 845, 858, 45 L. Ed. 1183, the Supreme Court of the United States, after a review of the ruling of the Supreme Court of Illinois in the cases of Pickering v. Cease, 79 Ill. 328; Lyon v. Culbertson, 83 Ill. 33, 25 Am. Rep. 349; Tenney v. Foote, 95 Ill. 99; Pearce v. Foote, 113 Ill. 228, 55 Am. Rep. 414; Cothran v. Ellis, 125 Ill. 496, 16 N. E. 646; Schneider v. Turner, 130 Ill. 28, 22 N. E. 497, 6 L. R. A. 164; and Soby v. People, 134 Ill. 66, 25 N. E. 109—held that:

"These cases hold these various propositions: (1) That 'option contracts' to sell or deliver grain or other commodity, or railroad or other stock, which contracts are intended to be settled by payment of differences at the settling date, are invalid. 79, 83, 113, and 125 Ill., supra. (2) A contract to have or give to himself an option to sell or buy at a future time any grain, etc., subjects the party to fine or imprisonment, and all contracts made in violation of the statute are gambling contracts, and void, under section 130, Cr. Code (Rev. St. 1874, p. 372, c. 38), and all notes or securities, part of the consideration of which is money, etc., won by wager upon an unknown or contingent event, as described in section 131 of the Code, are also void. 95 and 113 Illinois, supra. (3) An 'option contract' to sell or buy at a future time grain or other commodity or stock, etc., is void, under the Illinois statute, even though a settlement by differences was not contemplated. 130 Ill., supra. (4) The keeper of a shop or office where dealing is carried on in stock, etc., on margins, without any intention of delivering articles bought or sold, is guilty of an offense under the Illinois act of 1887 [Laws 1887, p. 96]. 134 Ill., supra."

The construction thus placed upon the state statute by the Supreme Court of Illinois is binding upon this court, not only as a construction of the statute of the state, but also as declaratory of the public policy of the state with respect to the character of the business that may be lawfully carried on within the borders of the state by the Chicago Board of Trade and other kindred organizations. Wade v. Travis Co., 174 U. S. 499, 19 Sup. Ct. 715, 43 L. Ed. 1060; Hartford Fire Ins. Co. v. Railway Co., 175 U. S. 91, 20 Sup. Ct. 33, 44 L. Ed. 84.

It is thus authoritatively settled that, under the statutes of the state of Illinois, it is unlawful for any person or corporation to keep or furnish an office or place wherein persons may, under the pretense of buying or selling grain or other produce, engage in speculating in futures and in gambling upon the rise or fall of the market, and every person and corporation is prohibited from communicating or receiving any statement or quotation of prices with a view to aiding in the carrying on of the prohibited gambling transactions.

Of the nature of the business carried on by the members of the Board of Trade there can be no question under the evidence sub-

mitted in this case. The testimony of the president of the board, William S. Warren, and of a large number of the members of the board was taken for the purpose of showing the character of the transactions had upon the floor of the exchange hall; and there is absolute unanimity in their evidence to the effect that much the larger part of these transactions were deals wherein it was not expected or understood that there would be any delivery of the article nominally dealt in, but the same were carried through and settled by methods clearly devised to avoid the need of actual delivery. The estimates of the witnesses vary as to the percentage of the transactions in which actual delivery was contemplated or had, running from 1 to 15 per cent., thus proving that at least 85 and more probably 95 per cent. of the transactions would come under the condemnation of the Illinois statute. We do not deem it necessary to set forth the details of this testimony, which can be found in the opinion of Judge Thompson in the case of The Board of Trade of the City of Chicago v. O'Dell Commission Co. (C. C.) 115 Fed. 574. In that case, and in Board of Trade v. Donovan Commission Co. (C. C.) 121 Fed. 1012, upon consideration of substantially the same evidence submitted in this case, the conclusion was reached that over 90 per cent. of the transactions had on the floor of the exchange hall maintained by the Chicago Board of Trade were purely gambling transactions.

It is thus proven beyond all reasonable question that the Chicago Board of Trade maintains in the building owned by it in the city of Chicago a place known as the "Exchange Hall," wherein the members of the board, acting for themselves, and also as brokers for outside parties, engage in making and carrying through deals in grain and provisions, in which it is not intended to make a future delivery of the article nominally dealt in, but which are to be settled by the payment of money only according to the fluctuations of the market and which are in all essentials gambling transactions. It further appears that the continuous quotations sent out by the Board of Trade are quotations of the prices bid and paid in connection with these speculative transactions had on the floor of the exchange. It further appears that the Board of Trade, for a specified price paid to it, furnishes these quotations to the telegraph companies, and authorizes them to send the same over their wires for delivery to all persons who will agree to take them under the terms fixed by the Board of Trade; these quotations being thus furnished by the Board of Trade and sent out over the lines of the telegraph companies as a means of encouraging speculation in futures and in gambling upon the rise and fall of the market, and for the purpose of bringing to the members of the Board of Trade as large a part of this speculative business as can be possibly secured. As already shown, the statute of Illinois, as construed by the Supreme Court of that state, absolutely forbids any person or corporation from keeping an office or place wherein gambling in grain or other produce is permitted, or from communicating or receiving any quotations of prices of such property with a view to encourage or aiding in gambling transactions in such property. The evidence clearly establishes the fact that the Chicago Board of Trade maintains in its exchange hall a place where-

in transactions coming within the inhibition of the statute are permitted and carried on, and the preparation and sending out of the continuous quotations of prices, based upon these forbidden transactions, are intended to aid its members, as well as outsiders, in engaging in speculative gambling on the rise and fall of the market, and therefore in both these particulars the Board of Trade violates the plain provisions of the statute.

The purpose of the bill filed in this case is to invoke the aid of the court, as a court of equity, in securing to the Board of Trade the pecuniary benefit derived from the communication and sale of quotations derived from transactions conducted by it in open violation of the statutes of the state in which it maintains its place of business, and to which state it owes its corporate existence. The powers of a court of equity cannot be successfully invoked for such a purpose. It will not lend its aid to the furtherance of transactions expressly forbidden by the statute, and thus declared to be contrary to the public policy of the state wherein the transactions are had. In seeking the aid of the court, under the circumstances developed in the evidence introduced in this case, the Board of Trade does not come with clean hands, nor for a lawful purpose, and for these reasons its prayer for aid must be denied. The conclusion thus announced relieves the court from the need of considering the other questions arising on the record, and which have been very fully presented in the briefs of counsel.

The decree appealed from is reversed, and the case is remanded to the Circuit Court, with instructions to dismiss the bill upon the merits at cost of the appellee.