LOGAN & BRYAN v. POSTAL TELEGRAPH & CABLE CO. et al.

(Circuit Court, E. D. Arkansas, W. D.    January 2, 1908.)

No. 1,620.

1. COURTS—STATES—ACTION AGAINST—INJUNCTION—CRIMINAL PROCEEDINGS.
    An action against the Attorney General and prosecuting officers of a state to enjoin them from instituting criminal proceedings is in effect an action against .the state, and cannot be maintained in a court of the United States under the eleventh amendment to the Constitution.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 844½.
    Federal jurisdiction of suits against state, see note to Tindall v. Wesley, 13 C. C. A. 165.]

2. INJUNCTION—CRIMINAL PROSECUTIONS.
    A court of equity has no power to restrain criminal proceedings, except when the equity proceedings are merely ancillary to proceedings already pending, or where property rights would be destroyed or rendered worthless by such criminal proceedings.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 178, 179.
    Restraining criminal proceedings, see note to Arbuckle v. Blackburn, 51 C. C. A. 133.]

3. APPEARANCE—EFFECT—WAIVER.
    The right of a defendant, in an action in which the jurisdiction of a national court is invoked upon the ground that a federal question is involved, to be sued in the district of which it is an inhabitant, is not jurisdictional, but merely a privilege which may be waived; and by entering an appearance generally and pleading to the merits the exemption is waived.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appearance, §§ 70-90.]

**4. CONSTITUTIONAL LAW—DUE PROCESS OF LAW.**

A statute making certain acts prima facie evidence of guilt is not unconstitutional as depriving a person of his liberty without due process of law, if he is permitted to rebut that presumption by proper proofs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 756.]

**5. SAME.**

There is nothing in the Constitution of the United States which prohibits a state from prescribing the evidence which is to be received in its courts, if the party is given an opportunity to explain away the prima facie presumptions of the statute.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 756.]

**6. GAMING—MARGINAL TRANSACTIONS—REGULATION—POLICE POWER.**

Under the police power every state has the right to declare dealings in futures on margins gambling, and to prohibit them within its borders.

**7. CONSTITUTIONAL LAW—POLICE POWER.**

Under the police power every state has the power to determine what is injurious to public health or morals; but courts may look at the substance of things, and if a statute purporting to have been enacted to protect the public morals has no real or substantial relation to that object, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 148.]

**8. SAME—IMPAIRMENT OF CONTRACTS.**

Contracts permitting lotteries or dealings which are declared by later statute to be gambling or are harmful to the morals of the people, and for which declaration there is substantial ground, are not within the protection of the Constitution of the United States prohibiting the impairment of contracts. They belong to the class of objects which demand the application of the maxim, "Salus populi suprema lex," and can no more be bargained away than the police power itself.

**9. SAME—POLICE POWER.**

Under the police power it is within the power of a state to exclude everything which is dangerous to its citizens, their health or morals, or which may cause them to be defrauded.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 148.]

**10. COMMERCE—INTERSTATE COMMERCE.**

Acts of a state in the proper exercise of its police power will not be declared void under the commerce clause of the Constitution of the United States even if they do incidentally affect interstate commerce, if their main purpose is to protect its people against wrong and fraud, or against contagious diseases, or acts which will corrupt their morals.

**11. CONSTITUTIONAL LAW—STATUTES—CONSTRUCTION.**

To justify a court in declaring an act of a Legislature void, as being in conflict with the Constitution, it is not enough that the statute goes to the verge of constitutional power. It must appear clearly that it goes beyond the power. In case of real doubt, the law must be sustained.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 46.]

**12. SPECIFIC PERFORMANCE—UNLAWFUL CONTRACT.**

Courts will refuse to enforce a contract, although lawful and enforceable in the courts of the nation where it is entered into and is to be performed, if it is against the public policy of the state in which it is sought to enforce it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 56, 173.]

13. CONTRACTS—PUBLIC POLICY.

:.    The public policy of a government is to be found in the statutes, or, in the absence of a statute, in the decisions of its courts; but where the law-making power speaks upon a particular subject over which it has constitutional power to legislate, public policy in such a case is what the statute enacts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 498.]

(Syllabus by the Court.)

## On Demurrers to Bill.

Complainants, in their bill, allege: That they are commission merchants in Chicago, and that under the express terms of their articles of copartnership each and every member of the firm is expressly prohibited, both upon an individual account and in the name of the firm, from engaging in any manner whatsoever, directly or indirectly, in speculative dealings relating in any way to the business of the firm and in any and all the articles of trade or commerce in which the firm or any of its members are in any way authorized to buy or sell, or in any way deal in, upon any of the exchanges of the Board of Trade hereinafter referred to, or in any other commodity or thing, or in any place whatsoever. That the Postal Telegraph & Cable Company is a corporation created by the state of Texas, engaged in the telegraph business, and the other defendants are, respectively, the Attorney General of the state of Arkansas and prosecuting attorneys for certain judicial circuits of that state. That complainants are now, and have been for some time past, members of the Board of Trade of Chicago, the New York and New Orleans Cotton Exchanges, and the New York Stock Exchange. That by contract entered into prior to January 8, 1907, the defendant telegraph company did, under and by authority of the powers it possessed, agree with complainants for the transmission of all quotations of the different exchanges before mentioned, and leasing of private wires for such transmission of all messages relating to their business, including quotations of prices. That the telegraph company had duly accepted the provisions of the acts of Congress relating to telegraph companies, and in pursuance thereof built its lines, connecting them with the cities where said exchanges are located and certain places in the state of Arkansas where complainants had correspondents located, and had also complied with all the laws of the state of Arkansas governing such corporations. That prior to January, 1907, complainants had entered into a contract with the said telegraph company for leases of private wires from the cities where said exchanges were located and a number of places in the state of Arkansas where complainants had correspondents; and thereupon they established, in connection with their business, certain offices in various places in the state of Arkansas for the purpose of transmitting over said leased wires all messages relating to their business.

The bill sets out fully the charters, regulations, and by-laws of the various exchanges of which they are members as aforesaid, which show that contracts for future delivery of the various articles and products were regularly made; that the quotations of these places are collected by them and furnished to the telegraph company, but upon condition that such quotations are not to be furnished by it to bucket shops or places where they are used as a basis for bets or illegal contracts of any kind, or where the contracts are to be settled merely by the difference in price, and not by actual delivery; that complainants had for some time prior to January 1, 1907, under their contract with the telegraph company, enjoyed the privilege of sending over their leased wires the quotations to their correspondents in the state of Arkansas, and these offices enjoyed the privilege of posting them on blackboards kept by these offices for the purpose of entering into contracts relating to purchase and sale of the said commodities, but only in strict conformity with the laws of said exchanges, and are in all respects lawful, and which are of great value to complainants; that all of said contracts on the Chicago Board of Trade contemplate a bona fide purchase and sale of property embraced in each transaction for actual delivery, subject to the rules and regulations of the said Board of Trade, and that all of such transactions are either for cash and present de-

livery, or future delivery actually to be made; that settlements are either made by actual delivery or offsetting similar contracts, but that for each contract, whether for purchase or sale of any of the commodities, notwithstanding the mode of settlement by offset, they have valid outstanding contracts with other members corresponding to the particular commodity, and that all of their contracts are entered into and carried out in strict accordance with the charter and by-laws of the said Board of Trade, and not otherwise; that no contracts are ever accepted by complainants, except for actual purchase or sale and delivery, merely speculative contracts to be settled by differences being absolutely refused, and their contracts cannot be canceled except by an order to sell the commodity bought.

Similar by-laws and rules regulate the transactions on the New York and New Orleans Cotton Exchanges and also the New York Stock Exchange, with these differences: All contracts on the stock exchange for less than 100 shares must be for immediate delivery for cash at the agreed price, but if for over 100 shares or bonds the delivery may be made at the time specified in the contract, but subject to adjustment between the members of the stock exchange; but they have at all times existing valid contracts for each transaction. Their business in Arkansas, through its correspondents, netted them over $10,000 a year, which will be utterly destroyed unless permitted to receive the quotations, placing them on blackboards, and transmit orders over their leased private wires. Although entitled by law to the full enjoyment of carrying on their business as aforesaid, their business being exclusively interstate, the defendants the Attorney General and prosecuting attorneys of the state of Arkansas threaten to interfere with criminal proceedings to be instituted for such transactions, thus resulting in an endless multiplicity of suits, both of a civil and criminal character. These proceedings are threatened under an act of the General Assembly of the state of Arkansas, entitled "An act to prohibit contracts and agreements for the sale and future delivery of cotton, grain, provisions, and other commodities, stocks, bonds, and other securities upon margins, commonly known as dealing in futures; to declare such transaction unlawful and to constitute a misdemeanor on the part of any person, association of persons, or corporation participating therein, whether directly or indirectly; to prohibit the establishment, maintenance, or operation of any office or other place where such contracts are made or offered; to define what shall constitute prima facie evidence of guilt; to compel all persons participating in such transaction to testify concerning their connection therewith; to provide that no discovery made by any witness which would tend to subject him to conviction or punishment under this act shall be used against such witness in any penal or criminal proceeding, and that he shall be altogether released from punishment by the court trying the offense; to provide that regular commercial exchanges and other bona fide organizations may post quotations of market prices, and for other purposes"—approved April 11, 1907. Acts Ark. 1907, p. 388. This act, it is charged, does not inhibit complainants from their business in the manner alleged in the bill, but the telegraph company claims it does. If this is true, then it is claimed the act is void as being in violation of section 1 of the fourteenth amendment, and sections 8, 10, art. 1, of the Constitution of the United States, as it will deprive them of their property without due process of law and impair the obligations of a contract, and would be an unjustifiable interference with interstate commerce. The telegraph company claims the act forbids it from allowing complainants to enjoy the right of transmitting over their leased wires the quotations aforesaid, and also to receive and transmit over said leased wires messages and telegrams pertaining to their business as aforesaid to their correspondents, and threatens that if any such messages are sent over said leased wires it will cancel its contract with complainants.

The bill then proceeds to charge that the Attorney General and prosecuting attorneys of the state propose, notwithstanding that provision of the act did not apply to transactions such as complainants are engaged in, or, if they did apply, are unconstitutional as aforesaid, to prosecute them in the criminal courts of the state and cause them to be arrested under the provisions of the act. The prayer for relief is that all the defendants be enjoined from interfering in any way with the complainants or the telegraph company carrying on

their business as they did prior to the passage of that act, by instituting any proceedings, civil or criminal, which may interfere with them or their agents, or the Postal Telegraph & Cable Company, or any customer who may choose to visit their offices and transact business with them; that the telegraph company be restrained from impairing or refusing to carry out the obligations of their contract entered into between them and complainants in relation to quotations, prices, leased wires, and other business.

The Postal Telegraph & Cable Company, which for short will be referred to as the "telegraph company," filed a general demurrer to the bill, on the ground that the allegations therein did not entitle complainants to any relief. The other defendants, the Attorney General and prosecuting attorneys of the state of Arkansas, demurred to the jurisdiction of the court.

Frederick H. Wickett, Rose, Hemingway, Cantrell & Loughborough, and D. S. Weg, for complainants.

W. F. Kirby, Atty. Gen., and Lewis Rhoton, Pros. Atty., for defendant state officials.

McLaurin & Wozencraft, for defendant telegraph company.

TRIEBER, District Judge (after stating the facts as above). The demurrer of the defendants the Attorney General and the prosecuting attorneys of the state of Arkansas must be sustained upon two grounds: First, for the reasons stated in Western Union Telegraph Co. v. Andrews (C. C.) 154 Fed. 95, this action must be deemed, so far as these defendants are concerned, a suit against the state within the inhibition of the thirteenth amendment to the Constitution of the United States; second, violations of the act involved in this action are made criminal offenses, cognizable solely in the criminal courts of the state, to be instituted by indictment of a grand jury or criminal information filed by a prosecuting attorney. That a court of equity has no power to restrain criminal proceedings, with few exceptions, is the established rule in England as well as in the courts of the United States. The leading case in the Supreme Court is In re Sawyer, 124 U. S. 200, 211, 8 Sup. Ct. 482, 31 L. Ed. 402, which has been followed and reaffirmed in numerous cases. Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399; Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535; Pacific Whaling Co. v. United States, 187 U. S. 447, 23 Sup. Ct. 154, 47 L. Ed. 253. The exceptions are where the equity proceedings are instituted by a party to a suit already pending before the court, and are in the nature of ancillary proceedings (Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584), or where the complainant had acquired property rights which, by the enforcement of the criminal laws enacted thereafter, would be destroyed and rendered worthless (Camden Interstate Ry. Co. v. City of Cattlesburg [C. C.] 129 Fed. 421).

Counsel rely upon Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 23 Sup. Ct. 498, 47 L. Ed. 778, and Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169, as modifying this rule; but a careful examination of the facts in these cases will show that they do not apply to the case at bar. In the Davis & Farnum Case the court, after reaffirming In re Sawyer, said that there are some exceptions to the general rule. It will be noticed that that question really was not necessary to the decision of the case, as it was determined upon another ground; and for this reason it might well be

treated as a dictum.   The learned justice who delivered the opinion of the court said:

"If there were jurisdiction in a court of equity to enjoin the invasion of property rights through the instrumentality of an unconstitutional law, that jurisdiction would not be ousted by the fact that the state had chosen to assert its power to enforce such law by indictment or other criminal proceeding."

The only case cited to this proposition is Springhead Spinning Co. v. Riley, L. R. 6 Eq. 551; but in the case cited that question was not decided at all, but what the court there did hold was that a continuing trespass which will result in destruction of property may be enjoined by a court of equity, although the action sought to be enjoined is an offense for which the parties could be prosecuted criminally.

In the Dobbins Case, which involved the same ordinance as did the Davis & Farnum Case, the court did expressly hold that:

"Where property rights will be destroyed, unlawful interferences by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity."

The only authority cited for this conclusion is Davis & Farnum Mfg. Co. v. Los Angeles; but, even had there been no authority whatever cited, if that decision is applicable to the facts in the case at bar, it is the duty of this court to follow it, regardless of former decisions, as it is the latest expression of the Supreme Court on that subject.   But it is a well-settled rule of law that:

"The opinion in a decision of a court must be read as a whole in the light of the facts upon which it is based.  The facts are the foundation of the entire structure, which cannot with safety be used without reference to the facts."   United States v. Wong Kim Ark, 169 U. S. 649, 18 Sup. Ct. 456, 42 L. Ed. 890; 26 A. & E. Enc. (2. Ed.) 169.

And this rule is especially applicable when the decision is based on an exception to the general rule of law.   The facts in the Dobbins Case were:   The city of Los Angeles on August 26, 1901, adopted an ordinance making it unlawful to erect and maintain gas works outside of a certain district described in the ordinance, and fixing penalties for the violation thereof.   While this ordinance was in force Dobbins made a contract with the gas company for the erection of certain gas works upon territory to be thereafter designated by the owner, and on September 28, 1901, purchased lands within the limits of the privileged district as fixed by ordinance.   On November 22, 1901, the plaintiff was granted permission to erect the gas works upon those premises, whereupon she directed the contractor to proceed with the erection of the works upon the premises so purchased.   After $2,500 had been expended upon the foundation, the city passed a second ordinance amending the first ordinance and thereby so limiting the bounds of the territory within which the erection of gas works was permitted in said city as to include the premises of the plaintiff within the prohibited territory.   The work of constructing the works was continuously prosecuted until the latter part of February, 1902, when the city caused the employés engaged in the erection of said works to be arrested, charged with violation of the last city ordinance.   Upon these facts the court held that the second ordinance was an impairment of the obligation of a contract and void, and as to the action of

the city in continually arresting the plaintiff's employés under that void ordinance a court of equity was justified in interfering to prevent a multiplicity of suits and the consequent annoyance. The opinion of the court was delivered by Mr. Justice Day, who two years before, as one of the judges of the United States Circuit Court of Appeals for the Sixth Circuit, delivered the opinion of that court in Arbuckle v. Blackburn, 113 Fed. 616, 51 C. C. A. 122, 65 L. R. A. 864, where he said:

"Upon this branch of the case the question is: May a court of equity entertain a bill to inquire into this matter, and, if it finds that the complainant is right in its contention, enjoin the food commissioner from instituting proceedings (criminal) under the laws of Ohio? * * * The jurisdiction of courts of equity has never been carried to this extent in authoritative decisions. On the contrary, the Supreme Court in more than one instance has denied such jurisdiction to a court of equity"—citing and quoting from In re Sawyer and Harkrader v. Wadley.

This clearly indicates that only the exceptional facts in the Los Angeles Case caused a departure from the general rule. The demurrer of these defendants must therefore be also sustained on this ground.

Before passing upon the demurrer of the defendant telegraph company, a matter of practice should first be disposed of. The complainants are citizens of Illinois, and the defendant a corporation existing under the laws of the state of Texas, but having an agent designated for service of legal process in this district. As Judiciary Act Aug. 13, 1888, c. 866, § 1, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508], provides that in actions arising under the Constitution or laws of the United States no civil suit shall be brought against any person by original process in any other district than that whereof he is an inhabitant, and when the jurisdiction is founded on the fact that there is a diversity of citizenship it shall be brought only in the district of the residence of either the plaintiff or defendant, an objection on the part of this defendant to the jurisdiction of the court would have been fatal. But defendant entered its appearance generally, and filed a general demurrer to the sufficiency of the bill, making no objection to being sued in a district of which it is not an inhabitant. After the close of the argument, it having been indicated by the court that the demurrer of the other defendants to the jurisdiction would probably be sustained, this defendant, without leave of the court, filed a paper with the clerk suggesting that the court was without jurisdiction, as neither the plaintiffs nor it were residents of this district. If residence in the district was jurisdictional, it would, of course, be immaterial when the question of jurisdiction was raised, or whether raised at all, for by Judiciary Act of March 3, 1875, c. 137, § 5, 18 Stat. 472 [U. S. Comp. St. 1901, p. 511], which is retained by section 6 of the act of 1888, it is made the duty of the court at any stage of the proceedings, when it shall appear to the court that it is without jurisdiction, to dismiss it. But are the foregoing provisions relating to the residence of the parties, if the necessary diversity of citizenship exists or there is a federal question involved, jurisdictional, which may not be waived?

In Ex parte Wisner, 203 U. S. 449, 27 Sup. Ct. 150, 51 L. Ed. 264, there is an expression by the court which would indicate that such is

the case; but this was clearly obiter, as that question was neither before the court nor necessary for the determination of the issue involved in that suit. In Central Trust Co. v. McGeorge, 151 U. S. 129, 14 Sup. Ct. 286, 38 L. Ed. 98, which was instituted when the act of 1888 was in force, the identical question was before the court, and it was held that the right to be sued in the district of the residence of either of the parties was merely a privilege, which could be waived and which is waived by pleading to the merits; and the fact that neither plaintiff nor defendant resides in the district in which the suit is brought does not prevent the operation of the waiver. To the same effect are Railway Co. v. McBride, 141 U. S. 127, 11 Sup. Ct. 982, 35 L. Ed. 659, and Railway Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905, 36 L. Ed. 829.

The courts have not been harmonious as to the effect of the dictum in Ex parte Wisner; the United States Circuit Court of Appeals for the Ninth Circuit holding that its effect is to make the residence of one of the parties to the action in the district jurisdictional, of which the court is bound to take notice, even without objection being made by either party (Yellow Aster, etc., Mining Co. v. Crane Co., 150 Fed. 580, 80 C. C. A. 566), while the United States Circuit Courts of Appeals for the Sixth and Eighth Circuits have followed the rule laid down in Central Trust Co. v. McGeorge, those courts in effect holding that that part of the opinion in Ex parte Wisner was obiter and not controlling (L. & N. R. R. v. Fisher [C. C. A.] 155 Fed. 68; McPhee & McGinnity Co. v. Union Pac. R. R. [Nov. 27, 1907, 8th Circuit; C. C. A.] 158 Fed. 5; Shanberg v. Fidelity & Casualty Co. [decided Nov. 4, 1907, 8th Circuit; C. C. A.] 158 Fed. 1; Corwin Mfg. Co. v. Henrici Washer Co. [C. C.] 151 Fed. 938). As, in the absence of an authoritative decision of the Supreme Court, that of the Circuit Court of Appeals for the Eighth Circuit is conclusive on this court, it follows that it must be held that the filing of the general demurrer by the telegraph company was a waiver of its exemption to be sued in this district, and its paper or motion will be stricken from the files.

This leaves for determination the main issue involved: Is the act of the General Assembly making it a misdemeanor for a telegraph company to knowingly receive in this state, for transmission, any messages relating to the purchase or sale of any commodity for future delivery on margins, or furnishing any leased wires within the state to be used for such purpose, void as being in conflict with the Constitution of the United States? If the act is a valid law, a court of equity would certainly not require the performance of a contract which would violate the laws of a state and subject the parties to punishment in criminal proceedings. Morris v. Western Union Tel. Co., 94 Me. 423, 47 Atl. 926, where it was held that, if a contract for futures is void as being a gambling contract, losses sustained by reason of a failure or delay in the transmission and delivery of a telegram are not recoverable as damages.

There were some other objections to the validity of the act which should be disposed of before determining the main issue involved. Sections 5, 6, and 7 of the statute make certain acts prima facie evidence of guilt; section 7 providing:

157 F.—37

"That proof that any person association of persons or corporations, either as principal or agent, has established an office or place where are posted or published from information received, the fluctuating prices of cotton, grain, provisions, stocks, bonds or other commodity or thing of value, or either of them, shall constitute prima facie evidence of guilt of the offense or offenses prohibited by this act."

This is claimed to be a deprivation of a person's liberty without due process of law. That such a provision is not in violation of the Constitution of the state of Arkansas has been, so far as the courts of the United States are concerned, conclusively settled by the Supreme Court of the state in Winton v. State, 77 Ark. 143, 91 S. W. 7; and that such a statute is not violative of any provision of the national Constitution has been fully determined in Adams v. New York, 192 U. S. 585, 24 Sup. Ct. 372, 48 L. Ed. 575. In that case a statute of the state of New York made the possession of policy slips prima facie evidence of the possession being knowingly in violation of the law. Mr. Justice Day, who delivered the opinion of the court, said:

"We fail to perceive any force in this argument. The policy slips are property of an unusual character and not likely, particularly in large quantities, to be found in the possession of innocent persons. Like other gambling paraphernalia, their possession indicates their use, or intended use, and may well raise some inference against the possession in the absence of explanation. Such is the effect of this statute. Innocent persons would have no trouble in explaining the possession of these tickets; and in any event their possession is only prima facie evidence, and the party is permitted to produce such testimony as will show the truth concerning the possession of the slips. Furthermore, it is within the statutory power of the state to prescribe the evidence which is to be received in the courts of its government."

The next question is: Has the state, under its police power, the right to declare dealing in futures on margins gambling contracts? That gaming is a vice which it is not only the right, but the duty, of the state to prohibit, is recognized by all. Under the police power, which is inherent in every state and government, the power to determine what is injurious to public health or morals must be determined by the lawmaking power, although there are limits beyond which Legislatures cannot rightfully go. It is said:

"Courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution." Mugler v. Kansas, 123 U. S. 623–661, 8 Sup. Ct. 273, 31 L. Ed. 205.

Other cases on the police power of the states which may be consulted are Patapsco Co. v. Board of Agriculture, 171 U. S. 345, 18 Sup. Ct. 862, 43 L. Ed. 191; Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; L'Hote v. New Orleans, 177 U. S. 595, 20 Sup. Ct. 788, 44 L. Ed. 899; Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108; Jacobson v. Massachusetts, 197 U. S. 11, 25 Sup. Ct. 358, 49 L. Ed. 643; C., B. & Q. R. R. v. Drainage Com'rs, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596; New Orleans v. Drain-

age Com'rs, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831; Reduction
Co. v. Sanitary Works, 199 U. S. 306, 26 Sup. Ct. 100, 50 L. Ed. 204;
Bacon v. Walker, 204 U. S. 311, 27 Sup. Ct. 311, 51 L. Ed. 499.

In Cunnius v. Reading School Dist., 198 U. S. 458, 469, 25 Sup. Ct.
721, 49 L. Ed. 1125, the court, in speaking of the effect of the Four-
teenth amendment on the police power of the states, said:

"That the amendment does not deprive the states of their police power over
subjects within their jurisdiction is elementary. The question, then, is not
the wisdom of the statute, but whether it was so beyond the scope of municipal
government as to amount to a want of due process of law."

A very able opinion on that subject, in which the authorities are
fully collated, is Grainger v. Douglas Park Jockey Club, 148 Fed. 513,
78 C. C. A. 199.

That the state may, through its legislative department, prohibit acts
of the nature proscribed in the act now under consideration, has been
frequently decided by the highest courts of the states; but it would
serve no useful purpose to cite them in this opinion, as the highest
court of this state has decided that such an act is not in conflict with
anything in the Constitution of this state. Fortenbury v. State, 47
Ark. 188, 1 S. W. 58, where the statute made it a misdemeanor "to
buy or otherwise deal in what is known as futures, either in cotton,
grain or anything whatsoever, with a view to profit, which is hereby
declared to be gambling." That such acts are not in conflict with
any provision of the national Constitution has been determined by the
Supreme Court in Booth v. Illinois, 184 U. S. 425, 22 Sup. Ct. 425, 46
L. Ed. 623; Otis v. Parker, 187 U. S. 606, 23 Sup. Ct. 168, 47 L. Ed.
323; Ballman v. Fagin, 200 U. S. 186, 26 Sup. Ct. 212, 50 L. Ed.
433.

In the Booth Case, the statutes of Illinois provided that:

"Whoever contracts to have, or give to himself or another, the option to sell
or buy at a future time any grain or other commodity, stock of any railroad or
other company, or gold, to forestall the market by spreading false rumors
to influence the price of commodities therein," etc., "shall be fined not less
than ten dollars nor more than one thousand dollars, or confined in the coun-
ty jail not exceeding one year, or both; and all contracts made in violation
of this section shall be considered gambling contracts and shall be void."

The validity of this act was sustained by the Supreme Court of
Illinois, and its decision affirmed by the Supreme Court of the United
States.

In the Otis Case the Constitution of California provided:

"All contracts for the sales of shares of the capital stock of any corpora-
tion or association, on margin, or to be delivered at a future day, shall be
void, and any money paid on such contracts may be recovered by the party
paying it by suit in any court of competent jurisdiction."

This provision was sustained by the court. Mr. Justice Holmes,
who delivered the opinion of the court, said:

"It is true, no doubt, that neither a state Legislature nor a state Constitu-
tion can interfere arbitrarily with private business or transactions, and that
the mere fact that an enactment purports to be for the protection of public
safety, health, or morals is not conclusive upon the courts. Mugler v. Kan-
sas, 123 U. S. 623, 661, 8 Sup. Ct. 273, 31 L. Ed. 205; Lawton v. Steele, 152

U. S. 133, 137, 14 Sup. Ct. 499, 38 L. Ed. 385. But general propositions do not carry us far. While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. * * * Even if the provision before us should seem to us not to have been justified by the circumstances locally existing in California at the time when it was passed, it is shown by its adoption to have expressed a deep-seated conviction on the part of the people concerned as to what that policy required. Such a deep-seated conviction is entitled to great respect. If the state thinks that an admitted evil cannot be prevented, except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere, unless, in looking at the substance of the matter, they can see that it is a clear, unmistakable infringement of rights secured by the fundamental law."

In the Ballmann Case, Ballmann had been committed for contempt in refusing to produce certain books before the grand jury of the United States District Court in Ohio, showing certain transactions of future dealings. His refusal was upon the ground that they would tend to criminate him, as the statutes of Ohio made dealings in futures on margins, a criminal offense. The Supreme Court held that this was a good ground for refusal, and discharged him, thus by implication holding such an act valid.

It is next claimed that as complainants had, prior to the passage of this act, relying upon the legitimacy of their business under the laws of the state, incurred great expense to fit offices for the conduct of their business, the act now under consideration is, in effect, an impairment of the obligations of a contract, in violation of the national Constitution. Assuming that the act of the General Assembly of the state of Arkansas approved March 30, 1883 (Acts 1883, p. 296), digested as sections 1753 and 1754, Kirby's Dig., and sustained in Fortenbury v. State, supra, did not apply to the business as conducted by complainants, are they protected by that constitutional provision? In Stone v. Mississippi, 101 U. S. 814, 25 L. Ed. 1079, the question before the court was whether, after the state had for a stipulated sum in cash granted a charter to a lottery company for 25 years, it could, before the expiration of that term, prohibit lotteries from conducting their business in the state, in the face of article 1; § 10, of the national Constitution; and it was held that, as lotteries might be prohibited by the police power as harmful to the morals of the people, the Legislature cannot bargain away the public health or public morals. The court said:

"The supervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot devest itself of the power to provide for them. For this purpose the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself."

This was reaffirmed in Douglas v. Kentucky, 168 U. S. 488, 18 Sup. Ct. 199, 42 L. Ed. 553. The same rule has been applied to the manufacture and sale of intoxicating liquors. In Beer Co. v. Mass., 97 U. S. 25, 24 L. Ed. 989, a question of that nature was before the

court, and in upholding the act of the state Legislature Mr. Justice Bradley, who delivered the opinion of the court, used this language:

"Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens and to the preservation of good order and the public morals. The Legislature cannot, by any contract, devest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, 'Salus populi suprema lex,' and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself."

In Mugler v. Kansas that question was again before the court, and the former decision of the court followed. Mr. Justice Harlan, who delivered the opinion of the court, said on that subject:

"It is true that, when the defendants in these cases, purchased or erected their breweries, the laws of the state did not forbid the manufacture of intoxicating liquors. But the state did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged. Indeed, as was said in Stone v. Mississippi (above cited), the supervision of the public health and the public morals is a governmental power, 'continuing in its nature,' and 'to be dealt with as the special exigencies of the moment may require,' and that 'for this purpose the largest legislative discretion is allowed,' and the discretion cannot be parted with any more than the power itself." 123 U. S. 669, 8 Sup. Ct. 301, 31 L. Ed. 205.

Since then this rule has been consistently adhered to by all the courts of the country.

Is the act in conflict with the interstate commerce clause of the Constitution? The contract between the complainants and the telegraph company relates solely to messages to be transmitted to and received from other states, and the leased wires were to connect the complainants' offices in the state of Arkansas with offices in other states. That the telegraph is an instrument of commerce, and that the foreign and interstate business of telegraph companies is subject to the regulating power of Congress, and any burdens placed on interstate business by a state is unconstitutional, has been conclusively determined in numerous cases. Pensacola Co. v. Western Union Tel. Co., 96 U. S. 1, 24 L. Ed. 708; Western Union Tel. Co. v. Texas, 105 U. S. 460, 26 L. Ed. 1067; Western Union Tel. Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187; Western Union Tel. Co. v. Alabama, 132 U. S. 472, 10 Sup. Ct. 161, 33 L. Ed. 409; Muskogee National Tel. Co. v. Hall, 118 Fed. 382, 55 C. C. A. 208. And it is claimed that for that reason the act is invalid in so far as it applies to the contract now sought to be specifically enforced by complainants against the telegraph company. The leading case relied on, on behalf of complainants, is Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128, where, after a most thorough review of the previous decisions on that subject, it was held that a law of the state prohibiting the sale of liquors, as applied to a sale by the importer and in original packages, is repugnant to the commerce clause of the national Constitution. Unless this case and the numerous cases following it can be distinguished by other authoritative decisions of that court from the case at bar, the contention of complainants, at least

until after there has been a delivery of the messages and the relation-ship of common carrier and sender has ceased, must be sustained.

The state of Arkansas, in the proper exercise of its police power, has declared dealings in futures on margins gambling and prohibited it. The question therefore is: Can it, under that police power, prohibit telegraph companies from aiding others to engage in what it has declared to be gambling, although the contracts are to be performed in other states, where such transactions are not prohibited? The identical question has never been determined by the Supreme Court of the United States, nor by any of the national courts whose judgments are conclusive on this court. It is true in Christie Grain Co. v. Board of Trade, 125 Fed. 161, 61 C. C. A. 11, it was held by the United States Circuit Court of Appeals for this (the Eighth) Circuit that the transactions on the Board of Trade of Chicago, one of the exchanges on which complainants operate and invoke the aid of this court for it, were gaming transactions; but that was determined on proof, while in the case at bar, the allegations of the bill, which the demurrer admits to be true, show the very reverse. In this connection it may be proper to state that the reversal of that case by the Supreme Court in 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, was upon a different point; that court holding that, even if the transactions on the Chicago Board of Trade were of such a nature as to constitute a bucket shop, it is certainly entitled to have its collection of quotations protected by the law and to keep the work which it has done to itself. "A collection of information, otherwise entitled to protection," the court said, "does not cease to be so because it concerns illegal acts; and statistics of crime are property to the same extent as other statistics, even if collected by a criminal who furnished some of the data."

It has been held in many cases by that court that it is within the power of a state, under its police power, to exclude anything which may become dangerous to its citizens; that it may exclude from its limits persons likely to become a public charge, or criminals, paupers, convicts, or persons afflicted with contagious or infectious diseases, and also protect its people from being defrauded or injured in their health, or anything which will corrupt their morals. In Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223, it was held that an act of that state prohibiting the sale of oleomargarine colored so as to permit deception in the manufacture and sale of imitation butter was a proper exercise of its police power and not in conflict with the commerce clause of the Constitution, although such sales were made in the original packages in which they were shipped from other states. In distinguishing that case from Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128, the court said:

"It is sufficient to say of Leisy v. Hardin that it did not in form or in substance present the particular question now under consideration. The article which the majority of the court in that case held could be sold in Iowa in original packages, the statute of that state to the contrary notwithstanding, was beer manufactured in Illinois and shipped to the former state to be there sold in such packages. So far as the record disclosed, and so far as the contentions of the parties were concerned, the article there in question was what it appeared to be, namely, genuine beer, and not a liquid or drink colored artificially so as to cause it to look like beer. The language we have quoted from

Leisy v. Hardin must be restrained in its application to the case actually presented for determination, and does not justify the broad contention that a state is powerless to prevent the sale of articles manufactured in or brought from another state, and subjects of traffic and commerce, if their sale may cheat the people into purchasing something they do not intend to buy, and which is wholly different from what its condition and appearance import."

Nor can it be said that this case was overruled, or even modified, in Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49. In that case it was held that, if the oleomargarine is not colored so as to mislead purchasers and practice a fraud on them, a state cannot prohibit its sale in the original packages when shipped from another state. The distinction between that case and the Plumley Case is plainly shown in Capital City Dairy Co. v. Ohio, 183 U. S. 238, 22 Sup. Ct. 120, 46 L. Ed. 171. Other cases upholding statutes prohibiting the sale of adulterated foods, although applying to imported articles sold in original packages, are Crossman v. Lurman, 192 U. S. 189, 24 Sup. Ct. 324, 48 L. Ed. 401; Arbuckle v. Blackburn, 113 Fed. 616, 51 C. C. A. 122, 65 L. R. A. 864; In re Scheitlin (C. C.) 99 Fed. 272.

In Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115, it was held that:

"The states may, by police regulations, protect their people against the introduction within their respective limits of infected merchandise," and by like regulation "exclude from their midst, not only convicts, paupers, idiots, lunatics, and persons likely to become a public charge, but animals having contagious diseases."

This was placed upon the distinct ground that:

"The police power of the states was not surrendered when the Constitution conferred upon Congress the general power to regulate commerce with foreign nations and among the several states."

In Rahrer's Case, 140 U. S. 545, 554, 11 Sup. Ct. 865, 35 L. Ed. 572, the Chief Justice, speaking for the court, said:

"The power of the state to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity is a power originally and always belonging to the states, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive; and this court has uniformly recognized state legislation, legitimately for police purposes, as not in the sense of the Constitution necessarily infringing upon any right which has been confided expressly or by implication to the national government."

In Geer v. Connecticut, 161 U. S. 579, 16 Sup. Ct. 600, 40 L. Ed. 793, the validity of a statute of the state of Connecticut prohibiting any persons from transporting, or having in possession with intent to procure their transportation, beyond the limits of the state, any such birds (those mentioned in the act) killed within the state, was before the court. It was claimed that the state may not forbid carrying such game beyond the limits of the state, inasmuch as the state had chosen to allow the people within her borders to take game and dispose of it, thus causing it to become an object of commerce, and as a result, of necessity, such property becomes the subject of interstate commerce,

and is hence controlled by article 1, § 8, of the Constitution of the United States. But this contention was by the court overruled; the court holding that the exercise of such power came directly within the principle laid down in Plumley v. Massachusetts, saying:

"The power of the state to protect by adequate police regulation its people against the adulteration of articles of food, although in doing so commerce might be remotely affected, necessarily carries with it the existence of a like power to preserve a food supply which belongs in common to all the people of the state, which can only become the subject of ownership in a qualified way, and which can never be the object of commerce, except with the consent of the state and subject to the conditions which it may deem best to impose for the public good."

It is true the facts in that case are distinguishable from those in the case at bar; but it is referred to for the purpose of showing that the police powers of the state are not affected in matters in which, incidentally, interstate commerce may be affected.

In Western Union Telegraph Co. v. James, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105, it was held that a state may prescribe how messages should be delivered within the state, whether received from within or without the state; the court holding that the validity of the statute is based upon the general power of the state to enact such laws in relation to persons and property within its borders as may promote the public health and public morals and the general prosperity and safety of its inhabitants. Mr. Justice Peckham, who delivered the opinion of the court, said:

"We see no reason to fear any weakening of the protection of the constitutional provision as to commerce among the several states by holding that in regard to such a message as the one in question, although it comes from a place without the state, it is yet under the jurisdiction of the state where it is to be delivered (after its arrival therein at the place of delivery), at least so far as legislation of the state tends to enforce the performance of the duty owed by the company under the general law. So long as Congress is silent on the subject, we think it is within the power of the state government to enact legislation of the nature of the Georgia statute. It is not a case where the silence of Congress is equivalent to an express enactment."

Similar statutes in which this question in its relation to interstate commerce have been uniformly upheld by the highest courts of the states: State v. Stripling, 113 Ala. 120, 21 South. 409, 36 L. R. A. 81; Louisville v. Wehmoff, 116 Ky. 812, 76 S. W. 876, 79 S. W. 201; Lacey v. Palmer, 93 Va. 159, 24 S. E. 930, 31 L. R. A. 822, 57 Am. St. Rep. 795; State v. Hardbourne, 70 Conn. 484, 4 Atl. 179, 40 L. R. A. 607, 66 Am. St. Rep. 126.

Those cases involved acts prohibiting poolrooms and the transmission of messages and money by telegraph to another state for the purpose of being placed as bets upon horse races. In each of these cases the same question raised in the case at bar was before the court. In the Wehmoff Case the court said:

"Here the thing prohibited is the transmission by a poolroom operator in the city of Louisville of messages intended for use—to be used—in a vicious enterprise. Their use is that of gambling, and is universally held in this country to be immoral, degrading, and injurious to society. Such use cannot have any legitimate purpose. The business of furnishing such messages, known to be intended solely for such use, makes the carrier essentially a participator in

that offense. Its part of the profits of the business is its tolls for carrying the messages. The poolroom operator's part is a toll or percentage on the volume of business. * * * The carrier wants us to say that its part in this unlawful partnership to violate the moral and statute laws of a community is protected by the federal Constitution. As was said by one of the courts, the Constitution, at most, gives the Congress exclusive jurisdiction to regulate interstate commerce, not interstate crime. The liquor cases are cited by appellees as holding a contrary doctrine to this court's position. We do not understand that they do. Traffic in liquor is not illegal or immoral per se."

So in the case at bar the people of this state, acting through the Legislature, have determined that contracts for futures on margins are immoral, and gambling, and for these reasons should be prohibited.

In Austin v. Tennessee, 179 U. S. 343, 349, 21 Sup. Ct. 132, 45 L. Ed. 224, Mr. Justice Brown, in speaking of the police powers of the state, said:

"We have had repeated occasion to hold, where state legislation has been attacked as violative either of the power of Congress over interstate commerce or of the Fourteenth amendment to the Constitution, that if the action of the state Legislature were as a bona fide exercise of its police power, and dictated by a genuine regard for the preservation of the public health or safety, such legislation would be respected, though it might interfere indirectly with interstate commerce."

In McLean v. Denver & Rio Grande R. R. Co., 203 U. S. 38, 27 Sup. Ct. 1, 51 L. Ed. 78, a statute of the territory of New Mexico, making it an offense for any railroad company to receive for ship- ment beyond the limits of the territory hides which had not been inspected as required by law, was sustained as not being "an unwarranted regulation of or burden on interstate commerce," the court saying:

"We see no reason why an inspection law which has for its purpose the protection of the community against fraud and promotion of the welfare of the people cannot be passed in the exercise of the police power, when the legislation tends to subserve the purpose in view. * * * It is true it affects interstate commerce; but we do not think such was its primary purpose, and while it may have an effect to levy a tax upon this class of property, the main purpose evidently was to protect the people against fraud and wrong."

So in the case at bar. While the act attacked may affect the telegraph company's interstate business, that was not its primary purpose; the main purpose being to prevent maintaining and operating a place of business in this state for dealing in futures on margins.

Another ground upon which the relief prayed may be denied is that places where these quotations are sought to be posted, or orders for these contracts taken, will naturally attract many persons who will congregate there for that purpose. In fact, the bill charges that in order to carry on their business successfully it is necessary that these quotations should be posted for the benefit of its customers. The state has declared such contracts gambling and unlawful, and such places would constitute a nuisance. For a very learned review of the authorities on this point the opinion of Chief Justice Hill in State v. Vaughan, 81 Ark. 117, 98 S. W. 685, may be consulted. The aid of the telegraph company by furnishing private wires at those places conveying the quotations of the exchanges, as well as transmitting the orders for

such unlawful contracts, is essential to the maintenance of these places, as without them the bill alleges the business of its correspondents cannot be successfully carried on. To grant the relief prayed would compel the telegraph company to aid in maintaining what the state has, in effect, determined to be a nuisance.

But, even if there be some doubt as to the constitutionality of the act, it is well settled that all doubts must be resolved in favor of he constitutionality of an act of the Legislature. It is well to refer here to the language of Chief Justice Marshall in Fletcher v. Peck, 6 Cranch, 87, 3 L. Ed. 162, the leading case on that question. He said:

"The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

Or in the language of Mr. Justice Holmes in Interstate, etc., Ry. Co. v. Massachusetts (decided Nov. 4, 1907) 207 U. S. 79, 28 Sup. Ct. 26, 52 L. Ed. ——:

"It is not enough that the statute goes to the verge of constitutional power. We must be able to see clearly that it goes beyond that power. In case of real doubt, a law must be sustained."

Does the fact that such contracts are valid in the states where they were to be made and performed, as is alleged in the bill, make it the duty of this court to enforce them, even if prohibited as immoral and against public policy in this state? The fact that this is a national court does not change the rules of law governing state courts in matters of this nature. It is as much the duty of a national court to respect and enforce the valid laws of the state in which it is held as it is the duty of the state courts to be governed by the Constitution and laws of the United States, although they are created by different governments and are independent of control by the other government. Cooper Mfg. Co. v. Ferguson, 113 U. S.727, 737, 5 Sup. Ct. 739, 28 L. Ed. 1137. The rule, as it has been determined by the courts of England, as well as by all the American courts, is that they will refuse to enforce a contract, although lawful and enforceable in the courts where it is entered into and is to be performed, if it is against the policy of the state in which it is sought to enforce it. Dicey on Conflict of Laws, p. 558; Brook v. Brook, 9 H. L. Cas. 193; Rousillon v. Rousillon, 14 Ch. Div. 351; Minor on Conflict of Laws, §§ 5, 13; Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539; Union Locomotive Co. v. Erie R. R. Co., 37 N. J. Law, 23; Witherspoon v. Musselman, 14 Bush (Ky.) 214, 29 Am. Rep. 404; Pittsburg, etc., Co.'s Appeal (Pa.) 4 Atl. 385; Hallam v. Tellerin, 55 Neb. 255, 75 N. W. 560; Dearing v. McKinnon, 165 N. Y. 78, 58 N. E. 773, 80 Am. St. Rep. 708; Pope v. Hanke, 155 Ill. 617, 40 N. E. 389, 28 L. R. A. 568; Minzeshimer v. Doolittle, 60 N. J. Eq. 394, 45 Atl. 611; Seamans v. Temple Co., 105

Mich. 400, 63 N. W. 408, 28 L. R. A. 430, 55 Am. St. Rep. 457; Smead v. Chandler, 71 Ark. 505, 511, 76 S. W. 1066, 65 L. R. A. 353.

In the Oscanyan Case, Chief Justice Field speaking for the court said:

"Admitting that the Turkish government was willing that its officers should be allowed to take commissions on contracts obtained for it by their influence, that is no reason why the courts of the United States should enforce them. Contracts permissible by other countries are not enforceable in our courts, if they contravene our laws, our morality, or our policy. The contract in suit was made in this country, and its validity must be determined by our laws. But had it been made in Turkey, and were it valid there, it would meet with the same reprobation when brought before our courts for enforcement. The general rule undoubtedly is that the validity of a contract is to be decided by the law of the place where it is made, unless it is to be performed in another country; but to this, as to all general rules, there are exceptions, and among these Story mentions contracts made in a foreign country to promote or reward the commission of crime, to corrupt or evade the due administration of justice, to cheat public agents, or to affect the public rights, and other contracts which in their nature are founded in moral turpitude, and are inconsistent with the good order and solid interest of society. 'All such contracts,' he adds, 'even although they might be held valid in a country where they are made, would be held void elsewhere, or at least ought to be, if the dictates of Christian morality or even of natural justice are allowed to have their due force and influence in the administration of international jurisprudence.' Story, Confl. L. § 258."

In Pope v. Hanke, the plaintiff sued on notes executed in Missouri in settlement of an option deal, which made them void under the statutes of Illinois, but were valid in Missouri where the transaction took place. The court refused to enforce them, saying:

"The enforcement of such foreign law would contravene the Criminal Code of this state, and would be in opposition of its public policy and the express prohibition of its statutory enactment, and would be prejudicial to the interests of its people."

In the Minzeshimer Case the highest court of New Jersey followed the same rule.

As to what constitutes public policy is clearly stated by Mr. Justice Peckham in United States v. Freight Ass'n, 166 U. S. 290, 340, 17 Sup. Ct. 540, 41 L. Ed. 1007, in the following terse language:

"The public policy of the government is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; but, when the lawmaking power speaks upon a particular subject over which it has constitutional power to legislate, public policy in such a case is what the statute enacts. If the law prohibit any contract or combination in restraint of trade or commerce, a contract or combination made in violation of such law is void, whatever may have been theretofore decided by the courts to have been the public policy of the country on that subject."

What has been said is upon the theory that the contracts made by complainants would be in violation of the act of the General Assembly of the state of Arkansas mentioned in the bill, although it is charged that the business is not within the prohibition of that act; but it is also charged that, if their business is in violation of the provisions of that act, then the act is unconstitutional as being in conflict with the various provisions of the Constitution of the United States mentioned

.in the bill. If their business is not violative of any of the terms of that act, then there is no reason for invoking the jurisdiction of a court of equity, for the law courts have ample power to grant all the relief complainants may be entitled to in an action for damages against the telegraph company for a breach of its contract. There is no allegation that a judgment for such a breach could not be collected, either owing to the insolvency of the telegraph company, or that it has not sufficient property subject to execution in this state to satisfy any judgment complainants might recover in an action at law. But as it was intimated at the hearing by counsel for complainant that they did not care to rely on that part of the bill, but preferred to have the court determine the main issue involved—the constitutionality of the act—the court has acted upon that suggestion.

The demurrer of the telegraph company will be sustained.